THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PUGET SOUNDKEEPER ALLIANCE,<br><br>Plaintiff,<br><br>v.<br><br>CRUISE TERMINALS OF AMERICA, LLC,<br><br>Defendant. | CASE NO. C14-0476-JCC<br><br>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT |

This matter comes before the Court on Defendant Cruise Terminals of America's motion for summary judgment (Dkt. No. 8) and Plaintiff's motion for leave to amend its complaint (Dkt. No. 22). Having thoroughly considered the parties' briefing, the relevant record, and the applicable law, the Court hereby DENIES Defendant's summary judgment motion (Dkt. No. 8) and GRANTS Plaintiff's motion to amend (Dkt. No. 22) for the reasons explained herein.

I.   **BACKGROUND**

   A.   **Plaintiff's Allegations Against Defendant Cruise Terminals of America**

This case arises under the Clean Water Act (CWA), 33 U.S.C. §§ 1251 *et seq*. Plaintiff Puget Soundkeeper Alliance (Soundkeeper), an environmental nonprofit organization, alleges that Defendant Cruise Terminals of America (CTA) violates the CWA by discharging industrial stormwater runoff and other pollutants into Elliott Bay, a navigable surface water, without a

National Pollutant Discharge Elimination System (NPDES) permit. (Dkt. No. 1 at 1–2, 5.) Soundkeeper seeks an order requiring CTA to apply for a NPDES permit, an injunction against further discharges until permit coverage is obtained, civil fines, and attorney's fees. (*Id.* at 1.)

Cruise Terminals of America, LLC (CTA) conducts business at Pier 66, 2225 Alaskan Way, Seattle, WA 98121, where it leases space from the Port of Seattle (Port). (Dkt. No. 10 at 2.) At Pier 66, CTA "oversee[s] vessel operations and building maintenance related to cruise ships during the five-month Alaska cruise season." (*Id*.) CTA's lease with the Port provides that "[CTA] shall manage and coordinate all Ship Activities at the Premises in a manner that supports the growth of cruise business in Seattle." (Dkt. No. 13, Ex. 2 at 69.) Under the lease, these responsibilities include scheduling cruise and non-cruise ships, managing security operations, obtaining street use permits and meter hoods, and coordinating passenger transportation, concierge services, baggage operations, deliveries of provisions, stevedoring services, food and beverage service to passengers, and parking for the Pier. (*Id.* at 70–71.)

CTA has a non-exclusive lease to the Terminal Building at Pier 66, and has a "right of preferential use" to its outdoor areas. (Dkt. No. 13, Ex. 2 at 56) ("Port grants Tenant a right of preferential use on a non-continuous, ship-by-ship basis of the Pier 66 Preferential Use Area."). Other entities also lease portions of Pier 66 from the Port, including the Bell Harbor Conference Center, Bell Harbor Marina, Anthony's Restaurant, Bell Harbor Deli, Columbia Hospitality's corporate offices, and the Wounded Warrior Project. (Dkt. No. 10 at 3.)

B. **Regulatory Framework Under the Clean Water Act**

The Clean Water Act is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Except as permitted under certain exceptions, Section 301(a) prohibits "the discharge of any pollutant" into waters of the United States "by any person." 33 U.S.C. § 1311(a). One exception is granted for discharges authorized by a National Pollutant Discharge Elimination System ("NPDES") permit, under which regulated discharges of pollutants are authorized so long as the discharger complies with

all applicable limitations. 33 U.S.C. § 1342(a)(1); *see Ass'n to Protect Hammersley, Eld & Totten Inlets v. Taylor Res., Inc*., 299 F.3d 1007, 1009 (9th Cir. 2002) ("A cornerstone of the Clean Water Act is that the 'discharge of any pollutant' from a 'point source' into navigable waters of the United States is unlawful unless the discharge is made according to the terms of an NPDES permit . . . ."). Under the NPDES program, the Administrator of the Environmental Protection Agency (EPA) or an appropriate state agency may issue permits authorizing the discharge of pollutants in accordance with specified limitations and conditions in the permit.[1] *See* 33 U.S.C. § 1342(a)–(b).

The CWA "exempt[s] from the NPDES permitting scheme most 'discharges composed entirely of stormwater.'" *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1332 (2013); *see* 33 U.S.C. § 1342(p)(1). Under Sections 402(p)(2) and 402(p)(3), however, NPDES permits remain necessary for stormwater "discharge[s] 'associated with industrial activity.'" *Decker,* 133 S. Ct. at 1332; *see* 33 U.S.C. § 1342(p)(3)(B). Industries covered by the industrial activity "Phase I" regulation are defined in accordance with Standard Industrial Classifications ("SICs"). *See Decker*, 133 S. Ct. at 1332. Transportation facilities classified as SIC 44xx are among those "considered to be engaging in 'industrial activity.'" *See* 40 C.F.R. § 122.26(b)(14) ("Transportation facilities classified as Standard Industrial Classifications . . . 44[xx] . . . have vehicle maintenance shops, equipment cleaning operations, or airport deicing operations.").

The EPA has promulgated regulations setting forth the NPDES permit application requirements for industrial stormwater discharges. *See* 40 C.F.R. § 122.26. These regulations require "[d]ischargers of storm water associated with industrial activity" to apply for an individual permit or seek coverage under a promulgated storm water general permit.[2] 40 C.F.R. §

---

[1] Pursuant to this statutory authority, the EPA has authorized the Washington Department of Ecology to administer Washington's NPDES program. *See* Wash. Rev. Code § 90.48.260.

[2] Likewise, the Washington Industrial Stormwater General Permit (ISGP) requires that "[f]acilities conducting industrial activities . . . shall apply for coverage under this permit." (Dkt. No. 9, Ex. A at 3.) The ISGP defines "facilities" as "any NPDES 'point source' . . . that is subject to regulation under the NPDES program." (*Id.* at 10.)

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND GRANTING
PLAINTIFF'S MOTION FOR LEAVE TO AMEND
COMPLAINT
PAGE - 3

122.26(c)(1). They also clarify that "[w]hen a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit." 40 C.F.R. § 122.21(b).[3] In addition to obtaining individual or general permit coverage, "an operator of a storm water discharge associated with industrial activity which discharges through a large or medium municipal separate storm sewer system" is required to submit certain information "to the operator of the municipal separate storm sewer system." 40 C.F.R. § 122.26(a)(4).

### C.    The Parties' Pending Motions

There are two motions pending before the Court. In the first, CTA moves for summary judgment on the sole basis that it does not qualify as an "operator" under the Clean Water Act. (Dkt. Nos. 8 at 7–11; 17 at 3, 10–12.) Because it is not an "operator," CTA argues, it has no obligation to obtain NPDES permit coverage and therefore cannot be liable under the CWA. (*Id.*) In response, Soundkeeper argues that such a conclusion is subject to disputed issues of material fact. (Dkt. Nos. 12 at 2; 13, Ex. 1–3.) In the alternative, Soundkeeper asks the Court to deny or defer ruling on CTA's motion under Federal Rule of Civil Procedure 56(d) so that it may conduct discovery to determine if CTA is the party discharging pollutants from Pier 66. (Dkt. No. 12 at 21–25.) The Court concludes that CTA's status as an "operator," while relevant as a practical matter, is not the proper framework for determining its liability.[4] And upon

---

[3] "Owner or operator means the owner or operator of any 'facility of activity' subject to regulation under the NPDES program." 40 C.F.R. § 122.2.

[4] The "owner or operator" argument fails to appreciate that whether CTA is Pier 66's "operator" for purposes of applying for NPDES permit coverage so that it is *exempt* from the general prohibition is a separate question from whether it is unlawfully discharging pollutants in the first place. Section 1311(a) states that "[e]xcept as in compliance with this section and section[] 1342 . . . , the discharge of any pollutant by *any person* is unlawful." 33 U.S.C. § 1311(a) (emphasis added). Section 1365(a)(1) authorizes citizen suits against "*any person* . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a)(1) (emphasis added). And it is well recognized that "the CWA's requirement that all discharges covered by the statute must have a NPDES permit is unconditional and absolute. Any discharge except pursuant to a permit is illegal." *United States v. Tom-Kat Dev., Inc.*, 614 F. Supp. 613, 614 (D. Alaska 1985); *see PennEnvironment v. PPG Indus., Inc.*, 964 F. Supp. 2d 429, 461 (W.D. Pa. 2013). This distinction is made clear by the fact that the pertinent CWA liability provision contains no "owner or operator" requirement, *see* 33 U.S.C. § 1311(a), and the only cases Defendant offers that have analyzed whether a party was an "operator" under the CWA relied upon on 33 U.S.C. § 1321(a)(6), which expressly defines "owner or operator" for purposes of *that* section's oil and hazardous substance penalty provisions. *See Resurrection Bay Conservation Alliance v. City of Seward, Alaska*, Case No. C06-0224,

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND GRANTING
PLAINTIFF'S MOTION FOR LEAVE TO AMEND
COMPLAINT
PAGE - 4

consideration of the proper question—the straightforward inquiry of whether CTA is the entity discharging stormwater without a permit—summary judgment is not appropriate at this stage of the proceedings.

Plaintiff also moves for leave to amend its complaint to add SSA Pacific, Inc. (SSAP) and the Port of Seattle (Port) as defendants. (Dkt. No. 22.) In that motion, Plaintiff explains that it has issued 60-day notices of intent to sue SSAP and the Port for similar unpermitted discharges from Pier 66. (*Id.* at 3.) No opposition to this motion has been filed. The Court addresses this motion and Defendant's summary judgment in turn.

## II. DISCUSSION

### A. Defendant's Summary Judgment Motion

#### 1. Legal Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party, *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247–50 (1986), and may consider extrinsic materials so long as they would be admissible in evidence. *See* Fed. R. Civ. P. 56(c). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving

---

2008 WL 508499, *5–6 (D. Alaska 2008); *Beartooth Alliance v. Crown Butte Mines*, 904 F. Supp. 1168, 1175 (D. Mont. 1995). Here, section 1319 is the appropriate penalty provision; section 1321's oil and hazardous substance provision appears not to be relevant. *See* 33 U.S.C. § 1365(a)(2) (authorizing district courts to assess "appropriate civil penalties under section 1319(d)" in citizen suits).

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND GRANTING
PLAINTIFF'S MOTION FOR LEAVE TO AMEND
COMPLAINT
PAGE - 5

party. *Anderson*, 477 U.S. at 248–49. Ultimately, summary judgment is appropriate only against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### 2. Plaintiff's Rule 56(d) Request for Additional Discovery

Plaintiff avers a genuine dispute of material fact with regard to whether CTA engages in industrial activity at Pier 66, and thus, whether CTA may be liable under the CWA. Plaintiff also argues in the alternative that, at minimum, the Court should provide it the opportunity to engage in discovery before ruling on CTA's summary judgment motion. Upon review, the Court agrees with Plaintiff that even if a genuine dispute of material fact was not readily apparent—a conclusion the Court declines to reach at this stage—summary judgment in CTA's favor is inappropriate given that Plaintiff has had no opportunity to engage in discovery and develop its theory of the case.

Federal Rule of Civil Procedure 56(d) provides that if a "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion [for summary judgment] or deny it . . . ." Fed. R. Civ. P. 56(d). This rule provides a mechanism "for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence." *Burlington Northern & Santa Fe R.R. Co. v. Assiniboine,* 323 F.3d 767, 773–74 (9th Cir. 2003). In order to obtain relief under Rule 56(d), a party must show "(1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resist the summary judgment motion." *State of California v. Campbell,* 138 F.3d 772, 779 (9th Cir. 1998). When a summary judgment motion is filed "so early in the litigation [that] a party has had [no] realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any [such] motion fairly freely." *Burlington Northern,* 323 F.3d at 773–74.

Plaintiff's Rule 56(d) request accords with the Rule's requirements. Soundkeeper's counsel's declaration was timely. (Dkt. No. 13.) The declaration also specifically identifies the relevant discovery sought when it states that the existing evidence warrants:

> [E]ntry onto the site with experts on the subject of stormwater management, terminal operations and environmental testing, among others; depositions of CTA officials, dock workers, and other third parties, such as the Port of Seattle, SSA Marine, Inc., . . . requests for documents, including information related to materials, machinery and contractors on site, service and equipment contracts, meeting minutes, and the like, among other requests.

(Dkt. No. 13 at 6.) The declaration explains that this desired discovery will likely disclose that "vehicle maintenance and equipment cleaning activities occur at the facility and related materials and substances are stored there," and "that CTA owns and/or controls equipment on site and . . . has the power or capacity to make timely discovery of industrial stormwater discharges, direct the activities of persons who control the mechanisms causing the pollution, and prevent and abate environmental damage." (Dkt. No. 13 at 6–7.)

Moreover, there is a reasonable basis for believing that the information Soundkeeper seeks exists. Soundkeeper's preliminary evidence indicates that industrial activities occur (or have historically occurred) at the Pier 66 facility, where CTA is a principal tenant. For instance, Pier 66's Stormwater Pollution Prevention Plan (SWPPP) states that the "potential stormwater contaminants used in the operation or maintenance of heavy equipment on site" include "[p]etroleum products . . . [b]atteries . . . [a]ntifreeze . . . [b]rake pads . . . [r]ubber tires," and references the "loading and unloading of liquid or solid material . . . at industrial, commercial, and transportation facilities." (Dkt. No. 13, Ex.1 at 16, 26.) Further, other environmental compliance reports specifically identify CTA as the entity in control of certain industrial activities at the Pier. The Port of Seattle's ECAP (Environmental Compliance Assessment Program) Form lists *CTA's* "Operational Activities" as: "Fueling, Vessel Loading, Cruise Facility, Outdoor Storage/Parking, Haz./Non-Haz. Waste, Painting/Paint Removal." (Dkt. No. 13, Ex. 3 at 5.) The corresponding "Stormwater Inspection Form" reiterates these same

operational activities, also indentifying these activities to CTA specifically rather than to the Pier at large. (*Id.* at 19.)

That CTA disputes its responsibility for and control over the aforementioned activities supports rather than detracts from Plaintiff's Rule 56(d) request. CTA points to SSA Pacific (a subsidiary of SSA Marine (Dkt. No. 23 at 1–2)) and the Port of Seattle as the entities responsible for these industrial operations. (*See* Dkt. No. 17 at 7) ("All of the acts PSA complains about regarding SSAP's outdoor mobile fueling and maintenance by SSAP occurred in connection with SSAP's arrangements with the cruise lines, not CTA."); (Dkt. No. 15 at 2) ("Historically, the landlord, the Port of Seattle, has conducted mobile fueling operations of the Gangway and Port equipment in the outdoor areas of the Pier."). The Port of Seattle's ECAP Form reports that "SSA brings a mobile fuel truck on-site regularly to fuel equipment." (Dkt. No. 13, Ex. 3 at 2, 8.) Yet SSAP and the Port also deny responsibility for these industrial activities. (Dkt. No. 13 at 3) ("SSA Marine . . . denie[s] any liability, claiming it conducts no operations at the facility at all . . . ."). The Court finds this disagreement over who is responsible for the alleged industrial activities occurring at Pier 66 improper for resolution on summary judgment, "[e]specially where, as here, documentation or witness testimony may exist that is dispositive of [the] pivotal question." *See Burlington Northern*, 323 F.3d at 774.

The Court also bases this ruling on the fact that CTA filed its motion for summary judgment early in this case based on no evidence other than the declaration of its General Manager. While CTA correctly points out that "[t]here is no bright-line rule [for deciding Rule 56(d) requests] based on the timing of the summary judgment motion," CTA brought this summary judgment motion just over five weeks after Soundkeeper filed suit. (Dkt. Nos. 8; 17 at 11.) The parties have not yet held their Rule 26(f) conference, the parties have not exchanged Rule 26(a)(1) initial disclosures, and the Court has not yet issued any scheduling order setting the

1  deadlines for discovery, disclosures, or trial. (Dkt. No. 13 at 4.) Consequently, Soundkeeper has
2  not "had the opportunity to discover information that is essential to [its] opposition."[5] *Anderson*,
3  477 U.S. at 250 n.5. In these circumstances, the Ninth Circuit interprets Rule 56(d) to require
4  additional discovery. *See Metabolife Int'l, Inc., v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001).
5  Accordingly, the Court grants Plaintiff's Rule 56(d) request for additional discovery "as a matter
6  of course," *see Burlington Northern*, 323 F.3d at 773–74, and denies CTA's motion for summary
7  judgment without prejudice to refiling after the parties have engaged in a reasonable amount of
8  discovery.

### B. Plaintiff's Motion to Amend

As noted above, Plaintiff seeks leave to file an amended complaint. The proposed amended complaint would add SSA Pacific, Inc. and the Port of Seattle as defendants. (*See* Dkt. No. 22.) Because this motion is unopposed and it is early in the litigation, the Court finds no reason to deny Sounkeeper's request. The motion for leave to amend is granted.

### III. CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's motion for summary judgment (Dkt. No. 8) without prejudice to refiling once the parties have had an opportunity to engage in discovery. The Court also GRANTS Plaintiff's motion for leave to file an amended complaint. (Dkt. No. 22.) Plaintiff shall file its amended complaint within seven (7) days of the date of this Order.

---

[5] Even if Soundkeeper had attempted to conduct discovery before responding to CTA's summary judgment motion, which was due June 2, 2014, CTA would not have been obligated to respond to those discovery requests after Soundkeeper's response was due. (Dkt. No. 13 at 5–6.)

1  DATED this 16th day of September 2014.

_____
John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND GRANTING
PLAINTIFF'S MOTION FOR LEAVE TO AMEND
COMPLAINT
PAGE - 10