THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PUGET SOUNDKEEPER ALLIANCE,

Plaintiff,

v.

CRUISE TERMINALS OF AMERICA,
LLC, et al.,

Defendants.

CASE NO. C14-0476 JCC

ORDER ON THE PARTIES' FIVE
MOTIONS FOR SUMMARY
JUDGMENT

This matter comes before the Court on plaintiff Puget Soundkeeper Alliance's

("Soundkeeper") motion for partial summary judgment (Dkt. No. 72), defendant Cruise

Terminals of America's ("CTA") two motions for summary judgment (Dkt. Nos. 38 and 86), and

defendant the Port of Seattle's ("Port") two motions for summary judgment (Dkt. Nos. 52 and

81). Having thoroughly considered the parties' briefing, the relevant record, and the parties' oral

arguments on November 17, 2015, the Court hereby GRANTS IN PART AND DENIES IN

PART Soundkeeper's motion for partial summary judgment (Dkt. No. 72) and CTA's first

motion for summary judgment (Dkt. No. 38). The Court DENIES CTA's second motion for

summary judgment (Dkt. No. 86) and both of the Port's motions for summary judgment (Dkt.

Nos. 52 and 81).

## I. BACKGROUND

### A. Factual Background

This case arises under the Clean Water Act (CWA), 33 U.S.C. §§ 1251 *et seq*.

Soundkeeper, an environmental nonprofit organization, alleges that CTA and the Port violate the

CWA by discharging industrial stormwater runoff and other pollutants into Elliott Bay, a

navigable surface water, without a National Pollutant Discharge Elimination System (NPDES) permit. (Dkt. No. 26 at 1–2, 6.) Soundkeeper seeks an order requiring CTA or the Port to apply for Washington State's Industrial Stormwater General Permit, an injunction against further discharges until permit coverage is obtained, civil fines, and attorney fees. (Dkt. No. 26 at 1, 5-6.)

CTA conducts business at Pier 66, 2225 Alaskan Way, Seattle, WA 98121, where it leases space from the Port. (Dkt. No. 10 at 2.) At Pier 66, CTA "oversee[s] vessel operations and building maintenance related to cruise ships during the five-month Alaska cruise season." (*Id.*) CTA's lease with the Port provides that "[CTA] shall manage and coordinate all Ship Activities at the Premises in a manner that supports the growth of cruise business in Seattle." (Dkt. No. 13-1 at 69.) Under the lease, these responsibilities include scheduling cruise and non-cruise ships, managing security operations, obtaining street use permits and meter hoods, and coordinating passenger transportation, concierge services, baggage operations, deliveries of provisions, stevedoring services, food and beverage service to passengers, and parking for the Pier. (*Id.* at 70–71.) Neither defendant has obtained an NPDES permit for Pier 66. (Dkt. Nos. 48-1 at 5 and 48-2 at 5.)

As required by the CWA, Soundkeeper served CTA with a Notice-of-Intent-to Sue Letter ("notice letter") on January 7, 2014. (Dkt. No. 26 at 10.) Soundkeeper filed its complaint against CTA on March 31, 2014. (Dkt. No. 1.) Soundkeeper sent a substantively identical notice letter to the Port on June 12, 2014. (Dkt. No. 26 at 38.)  On June 18, 2014, Soundkeeper filed a motion to amend its complaint to add the Port as an additional defendant. (Dkt. No. 22.) After the Court granted Soundkeeper's motion, (Dkt. No. 25), Soundkeeper amended its complaint on September 22, 2014. (Dkt. No. 26.)

1

2

**B. Regulatory Background**

The Clean Water Act ("CWA") is intended to "restore and maintain the chemical,

physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Except as

permitted under certain exceptions, section 301(a) prohibits any person from discharging

pollutants from any "point source"[1] into navigable waters. *See* 33 U.S.C. § 1311(a), §

1362(12)(A); *Comm. to Save Mokelumne River v. East Bay Util.*, 13 F.3d 305, 309 (9th Cir.

1993). One exception is granted for discharges authorized by a National Pollutant Discharge

Elimination System ("NPDES") permit, which allows regulated discharges of some pollutants

despite § 301(a)'s general prohibition, so long as the discharger complies with all applicable

limitations. 33 U.S.C. § 1342(a)(1). Under the NPDES program, the Administrator of the

Environmental Protection Agency ("EPA") may issue permits to point sources authorizing the

discharge of pollutants in accordance with specified limitations and conditions set forth in the

permit.[2] 33 U.S.C. § 1342(a).

CWA sections 402(p)(2) and 402(p)(3) mandate NPDES permits for stormwater

"discharge[s] associated with industrial activity." *See* 33 U.S.C. § 1342(p)(3)(A). Industries

covered by the industrial activity "Phase I" regulation are defined in accordance with Standard

Industrial Classifications ("SICs"). *See Decker v. N.W. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1332

---

[1] A "point source" is defined as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

[2] Congress has empowered the EPA Administrator to delegate NPDES permitting authority to state agencies. 33 U.S.C. § 1342(b). Pursuant to this authority, the EPA has authorized the Washington Department of Ecology ("Ecology") to administer Washington's NPDES program, which includes developing water quality standards and issuing NPDES permits. *See* Wash. Rev. Code § 90.48.260. The State Water Pollution Control Act makes it illegal for "any person" to discharge pollutants into waters of the state without a permit. Wash. Rev. Code §§ 90.48.080, 90.48.160.

(2013).  Transportation facilities classified as SIC 44xx are among "those considered to be engaging in 'industrial activity.' " 40 C.F.R. § 122.26(b)(14)(viii). However, only those portions of a SIC 44xx facility that are "involved in *vehicle maintenance* (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication), [or] *equipment cleaning operations*…are associated with industrial activity." 40 C.F.R. § 122.26(b)(14)(viii) (emphasis added).

The EPA has promulgated regulations setting forth the NPDES permit application requirements for industrial stormwater discharges. *See* 40 C.F.R. § 122.26. These regulations require "[d]ischargers of storm water associated with industrial activity" to apply for an individual permit or seek coverage under a promulgated storm water general permit.[3] 40 C.F.R. § 122.26(c)(1); *Natural Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1304–05 (9th Cir. 1992) (detailing EPA's regulations regarding "industrial activity" sources). "When a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit." 40 C.F.R. § 122.21(b).[4]

To enforce its provisions, the CWA authorizes any citizen to bring suit against any person for violation of any "effluent standard or limitation" under the Act. 33 U.S.C. § 1365(a). An "effluent standard or limitation" includes "an unlawful act" under Section 301(a) of the CWA. 33 U.S.C. § 1365(f)(1). Liability for a violation of the Clean Water Act is strict, *i.e.*, there is no *de minimis* defense. *Sierra Club v. Union Oil of Cal.*, 813 F.2d 1480, 1490–91 (9th Cir. 1987).

---

[3] Likewise, the Washington ISGP requires that "[f]acilities conducting industrial activities . . . shall apply for coverage under this permit." (Dkt. No. 9-1 at 3.) The ISGP defines "facilities" as "any NPDES 'point source' . . . that is subject to regulation under the NPDES program." *Id.* at 10.

[4] "Owner or operator means the owner or operator of any 'facility of activity' subject to regulation under the NPDES program." 40 C.F.R. § 122.2.

ORDER ON THE PARTIES' FIVE MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 4

1

2

**C. The Parties' Pending Motions**

There are five motions for summary judgment pending before the Court.

3

4

In CTA's first motion, it moves for summary judgment on the following claims: (1) that

5

vessel-related activities at Pier 66 do not interface with stormwater; (2) that vessel-related claims

6

are exempt from ISGP coverage because vessels are covered by a separate permit; (3) that the

7

offloading of sewage from a vessel is exempt from ISGP coverage; (4) that the gangway at Pier

8

66 is not a vehicle; and (5) that Soundkeeper's notice letter to CTA was insufficient. (Dkt. No.

9

38 at 2-3.)

10

In the Port's first motion, it moves for summary judgment on the following claims: (1)

11

that Soundkeeper's notice letter to the Port was insufficient; and (2) that the Court lacks

12

jurisdiction over Soundkeeper's claims regarding future violations. (Dkt. No. 52 at 4, 13.)

13

In Soundkeeper's motion, it moves for partial summary judgment on the following

14

claims: (1) that stormwater discharges from the Pier 66 cruise terminal are point source

15

discharges of stormwater "associated with industrial activity" under 40 C.F.R. §

16

122.26(b)(14)(1)(viii) that violate the 33 U.S.C. § 1311(a) prohibition on unauthorized

17

discharges; (2) that the cruise terminal discharged such stormwater on at least 320 days between

18

January 30, 2009 and June 15, 2015; (3) that Soundkeeper provided adequate presuit notice; (4)

19

that Soundkeeper has standing; (5) that the cruise terminal has Clean Water Act ("CWA")

20

violations; and (6) that CTA and the Port are strictly liable for the ongoing unpermitted

21

22

discharges. (Dkt. No. 72 at 4.)

23

In the Port's second motion, it moves for summary judgment on the following claims: (1)

24

that the Port does not engage in industrial activities at the cruise terminal; (2) that there is no

25

26

reasonable likehood that any past industrial activities will recur; and (3) that the Port does not operate the cruise terminal.

In CTA's second motion, it moves for summary judgment on the following claims: (1) that no vehicle maintenance activity currently occurs at the cruise terminal; and (2) that CTA does not operate the cruise terminal.

One each of these motions, the Court holds as follows:

CTA's first motion is GRANTED IN PART AND DENIED IN PART. The Court finds that vessel-related activities may interface with stormwater if they create discharge that falls on the cruise terminal, and that these activities are not exempt from ISGP coverage even though they are covered by a separate permit. The Court also finds that Soundkeeper's notice letter to CTA was sufficient, but that the offloading of sewage from a vessel is exempt from ISGP coverage, and that the gangway is not a vehicle.

The Port's first motion is DENIED. The Court finds that Soundkeeper's notice letter to the Port was sufficient, and that Soundkeeper's claims regarding future violations have been mooted.

Soundkeeper's motion is GRANTED IN PART AND DENIED IN PART. The Court finds that Soundkeeper has standing and provided adequate notice to both Defendants. However, the Court cannot decide the rest of Soundkeeper's claims due to genuine disputes of material fact.

The Port's second motion and CTA's second motion are both DENIED. The Court finds that industrial activities—including vehicle maintenance activities—are ongoing at the cruise terminal, although they might not require an ISGP. The Court also finds that because CTA and

1  the Port exercise sufficient control over the cruise terminal, both may be found liable for

2  unpermitted discharges regardless of who is the facility's operator.

3       We now explain the reasoning behind each of our holdings.

4  **II. DISCUSSION**

5       Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant

6  summary judgment if the movant shows that there is no genuine dispute as to any material fact

7  and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such

8  a determination, the Court must view the facts and inferences to be drawn therefrom in the light

9  most favorable to the nonmoving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50

10 (1986), and may consider extrinsic materials so long as they would be admissible in evidence.

11 *See* Fed. R. Civ. P. 56(c). Once a motion for summary judgment is properly made and supported,

12 the opposing party "must come forward with specific facts showing that there is a genuine issue

13 for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Material

14 facts are those that may affect the outcome of the case, and a dispute about a material fact is

15 genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving

16 party. *Anderson*, 477 U.S. at 248–49. Ultimately, summary judgment is appropriate only against

17 a party who "fails to make a showing sufficient to establish the existence of an element essential

18 to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*

19 *v. Catrett*, 477 U.S. 317, 322 (1986).

20       **A. Soundkeeper Has Standing to Bring This Lawsuit**

21       Soundkeeper argues that its members have suffered injuries in fact that are fairly

22 traceable to Defendants' alleged violations of the CWA, and are redressable by the relief sought.

23 (Dkt. No. 26 at 3-4.) Soundkeeper further argues that the interest at stake in this lawsuit is

1   germane to its organizational purpose—environmental protection—and that neither the claim

2   asserted nor the relief sought requires its individual members' participation. (*Id.*) The Court

3   agrees, and neither Defendant disputes these arguments.

4       Therefore, the Court now holds that, as a matter of law, Soundkeeper has standing to

5   proceed with its claims. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528

6   U.S. 167, 180-81 (2000) (explaining the requirements for organizational standing).

7   **B. Only Discharges From Pier 66's Stormwater Drainage System Might Require an**

8   **ISGP**

9

10      Pier 66 contains a stormwater drainage system that collects and channels stormwater into

11  a municipal separate sewer that drains to a surface body of water. (Dkt. No. 38 at 11.) A portion

12  of Pier 66—the service area—separately drains into a combined sewer system. (Dkt. No. 69 at

13  2.) Even though the Port has obtained a Phase I Municipal Stormwater Permit ("Municipal

14  Permit") for Pier 66, (Dkt. No. 83 at 1-2), Soundkeeper argues that this permit is inadequate for

15  the discharges that are allegedly occurring.

16      The Court agrees that the Municipal Permit may not be adequate for the discharges to the

17  municipal separate sewer system. The Municipal Permit itself states that a separate NPDES

18  permit is required for facilities that create stormwater discharges associated with industrial

19  activity. (Dkt. No. 44-1 at 19, 21.) In a Final Rule implementing the NPDES regulations, EPA

20  similarly clarified that "discharges through a municipal storm sewer need to be covered by an

21  NPDES permit that is independent of the permit issued for discharges from the municipal

22  separate storm sewer system." *National Pollutant Discharge Elimination System Permit*

23  *Application Regulations for Storm Water Discharges*, 55 Fed. Reg. 47990, 47995 (November 16,

24  1990).

But discharges from the service area to the combined sewer system are not considered discharges to "waters of the state" and do not require an ISGP. (Dkt. No 13-2 at 41.) The EPA has also stated that such discharges are exempt from its stormwater regulations. (Dkt. No. 95-2 at 7); *see also* 33 U.S.C. § 1362(12)(A) (defining "discharge of a pollutant" as "any addition of any pollutant to navigable waters" or "to the waters of the contiguous zone or the ocean"). The Court therefore finds that no permit is required for discharges from the Pier 66 service area to the combined sewer system.

**C. The Cruise Terminal Is a SIC 44xx Water Transportation Facility**

Soundkeeper argues that the cruise terminal at Pier 66 is a water transportation facility classified under Major Group 44—in other words, a SIC 44xx facility. The Port, which owns the cruise terminal, has admitted that it is a SIC 44xx facility. (Dkt. No. 48-1 at 4.) Lynn Wood, a consultant retained by the Port to perform an Environmental Compliance Assessment Program (ECAP) report, also testified that based on the ECAP, she believes that the cruise terminal is a SIC 44xx facility. (Dkt. No. 72-4 at 11-12.) However, CTA denies that the cruise terminal is so classified, although it provides no argument in its briefing in support of this denial. (Dkt. No. 48-2 at 5.)

According to the Occupational Safety & Health Administration, Major Group 44 "includes establishments engaged in freight and passenger transportation on the open seas or inland waters," such as "excursion boats [and] sightseeing boats." (Dkt. No. 13-2 at 71.) The cruise terminal at Pier 66 is a facility where passengers board cruise ships bound for Alaska. (Dkt. Nos. 10 at 2, 13-2 at 18, 44-1 at 4.) Such an establishment operates "excursion boats" that

are "engaged in...passenger transportation on the open seas or inland waters." [5] (Dkt. No. 13-2 at

71.) Given the Port's admission, the testimony of its ECAP consultant, and the fact that CTA has

offered no argument in support of its denial, the Court finds that there is no genuine dispute as to

whether the cruise terminal at Pier 66 is a SIC 44x facility. It clearly is. However, at this time we

need not determine which Industry Group the cruise terminal specifically falls into under Major

Group 44, because all SIC 44xx facilities with "vehicle maintenance shops" or "equipment

cleaning operations" are "considered to be engaging in 'industrial activity.'" 40 C.F.R. §

122.26(b)(14)(viii).

### D. Both of Soundkeeper's Notice Letters Were Sufficient

Defendants spend much of their briefing arguing that Soundkeeper provided them with

deficient notice prior to its suit. Although their arguments have some merit, the Court finds that

Soundkeeper's notice letters were sufficient.

"[A] party who wishes to sue under the CWA's citizen enforcement provisions may not

commence an action until at least 60 days after giving notice of intent to sue." 33 U.S.C. §

1365(b). 40 C.F.R. § 135.3(a) explains what proper notice must include:

> Notice regarding an alleged violation of an effluent standard or limitation or of an
> order with respect thereto, shall include sufficient information to permit the
> recipient to identify the specific standard, limitation, or order alleged to have been
> violated, *the activity alleged to constitute a violation, the person or persons*
> *responsible for the alleged violation, the location of the alleged violation, the date*
> *or dates of such violation*, and the full name, address, and telephone number of the
> person giving notice. (emphasis added).

Ninth Circuit courts have "strictly construed" the notice requirements for citizen suits

under the CWA. *San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1158 (9th Cir.

2002). Therefore, the Court must ensure that Soundkeeper has met all the aforementioned

---

[5] In addition, non-cruise ships berth at Pier 66 year-round. (Dkt. No. 72-3 at 15.)

1  requirements of 40 C.F.R. § 135.3(a). But the regulation does not require "that plaintiffs list

2  every specific aspect or detail of every alleged violation." *Id.* (internal quotation marks omitted).

3  Instead, "[t]he key language in the notice regulation is the phrase 'sufficient information to

4  permit the recipient to identify the alleged violations and bring itself into compliance.'" *Id.*

5  (quoting 40 C.F.R. § 135.3(a)). The touchstone of proper notice is whether "it is specific enough

6  to give the accused company the opportunity to correct the problem." *Id.* (internal quotation

7  marks omitted).

8      Defendants do not dispute that Soundkeeper specifically alleged that 33 U.S.C. §§ 1311

9  and 1342 were the standards violated. Nor do they dispute that Soundkeeper provided its name,

10  address, and telephone number as the party giving notice. But Defendants argue that

11  Soundkeeper insufficiently identified the location of the violation, the activity alleged to

12  constitute a violation, the dates the violation allegedly occurred, and the persons responsible.

13  Furthermore, CTA requests that all complaints not addressed in the notice letter be stricken. The

14  Court will address these arguments in turn.

15

16      **1. Soundkeeper Sufficiently Notified Defendants of a Point Source**

17

18      Only pollutants that are discharged from a "point source" require a permit. (Dkt. No. 39-1

19  at 9) (defining "discharge [of a pollutant]" as occurring from a "point source"); *see also* 33

20  U.S.C. § 1362(12) (providing a similar definition). Although the Court briefly defined "point

21  source" above, its full definition is as follows:

22

23      [A]ny discernible, confined and discrete conveyance, including but not limited to
        any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling
24      stock, concentrated animal feeding operation, or vessel or other floating craft,
        from which pollutants are or may be discharged. 33 U.S.C. § 1362(14).
25

26      In its notice letters, Soundkeeper included the following information regarding the point

source of Defendants' alleged unpermitted discharges:

ORDER ON THE PARTIES' FIVE MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 11

1

2

3

4

[CTA/The Port is]discharging pollutants from its water transportation facility
located at or about Pier 66…to waters of the United States….The facility subject
to this notice includes any contiguous or adjacent properties owned or operated by
[CTA/The Port] as a cruise terminal….[CTA/The Port] discharges industrial
stormwater and pollutants to Elliot Bay and Puget Sound directly and/or via a
stormwater drainage system….The site is a water transportation facility where
mobile fueling and other maintenance activities occur. (Dkt. No. 26 at 10-11.)[6]

5

6

7

Soundkeeper argues that it alleged two separate point sources: the stormwater drainage

system at the cruise terminal, and the cruise terminal itself. Defendants argue that these point

sources were not specific enough.

8

9

10

11

12

13

14

15

16

According to Defendants, in order to identify "the location of the alleged violation" under

40 C.F.R. § 135.3(a), Soundkeeper needed to identify specific discharge points in its notice

letters. But neither Defendant provides any binding authority for this point, and the Court

disagrees. Although a discharge must occur from a point source in order to require a permit

under the CWA, a notice letter need not identify every specific discharge point at a facility: the

crux of proper notice is whether Defendants were sufficiently informed so as to be able to

remedy the alleged violations. *San Francisco BayKeeper*, 309 F.3d at 1158.

17

18

19

20

21

22

The Court agrees with Soundkeeper that the stormwater drainage system at the cruise

terminal is a sufficient point source. The Ninth Circuit has found that a stormwater drainage

system "is exactly the type of collection or channeling contemplated by the CWA." *Greater

Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1152 (9th Cir. 2010). To the extent that Soundkeeper

needed to identify which drainage points Defendants should focus on in order to remedy

23

24

25

26

---

[6] In Soundkeeper's notice letter to the Port, it also alleged that "equipment cleaning" activities
occur at the facility. (Dkt. No. 26 at 38-39.) As we explain below, because Soundkeeper only
notified the Port of this alleged violation, only the Port—and not CTA—may be liable for it. In
this Order, the Court may, on occasion, state that Defendants may be liable for any "vehicle
maintenance" or "equipment cleaning" activities that take place at the facility. By this we mean
that CTA may be liable for the former activity, and that the Port may be liable for both.

potential violations, it has done so: drainage points in the cruise terminal that are near areas where "mobile fueling and other maintenance activities occur." (Dkt. No. 26 at 10-11.)

The Court finds, however, that the cruise terminal itself is not a point source. "[P]oint and nonpoint sources are not distinguished by the kind of pollution they create or by the activity causing the pollution, but rather by whether the pollution reaches the water through a confined, discrete conveyance." *Trustees for Alaska v. E.P.A.*, 749 F.2d 549, 558 (9th Cir. 1984). Soundkeeper has failed to identify any manner in which the cruise terminal itself, separate from its stormwater drainage system, operates as a "confined, discrete conveyance." *Id.*

### 2. Soundkeeper Sufficiently Notified Defendants of the Activities Alleged to Constitute a Violation

As explained above, proper notice must identify the activity causing the violation. 40 C.F.R. § 135.3(a). Defendants argue that Soundkeeper's notice letters did not identify such an activity with sufficient specificity. However, "the Clean Water Act's notice provisions and their enforcing regulations require no more than reasonable specificity." *San Francisco BayKeeper*, 309 F.3d at 1158 (internal quotations omitted). Moreover, this specificity is not required in and of itself—it has an end goal: enabling the notice letter's recipient to identify and remedy any polluting discharges. *Id.* Neither Defendant disputes this point. (*See* CTA's First Motion for Summary Judgment, Dkt. No. 38 at 17) (stating that "the purpose of the notice requirement is ameliorative, providing the alleged offender an opportunity to identify and correct the alleged violations"); (*see also* the Port's First Motion for Summary Judgment, Dkt. No. 52 at 7) (stating that "[t]o be sufficient for purposes of [the CWA], the information given in the notice letter must be specific enough to give the accused company the opportunity to correct the problem")

(internal quotation marks omitted).) As we explain below, the Court finds that Soundkeeper

identified the violating activities with enough specificity for Defendants to remedy them.[7]

In the "Unpermitted Discharges" section of its notice letters, Soundkeeper informed

Defendants of its violations as follows:

> [Defendants have] violated and continue[] to violate Section 301(a) of the CWA,
> 33 U.S.C. § 1311, by discharging pollutants from its water transportation facility
> located at or about Pier 66…to waters of the United States without a NPDES
> permit….[Defendants] discharge[] industrial stormwater and pollutants to Elliot
> Bay directly and/or via a stormwater drainage system. On information and belief
> these pollutants include turbidity, suspended and dissolved solids, oxygen
> demanding substances, non-neutral pH, hydrocarbons, and metals, including
> copper and zinc. These violations of the CWA have occurred on each day from
> June 1, 2009, through the present during which there was a stormwater discharge
> from the facility, generally including days on which there has been at least 0.1
> inch of precipitation, and continue to occur….The violations alleged in this notice
> will continue until the Port obtains and comes into compliance with a NPDES
> permit authorizing such discharges. (Dkt. No. 26 at 10 and 38-39.)

Then, in the "Industrial Stormwater General Permit requirements" section of its notice

letters, Soundkeeper provided the following notifying information:

> The Washington Department of Ecology ('Ecology') authorizes discharges of
> stormwater associated with certain industrial activities under the Industrial
> Stormwater General Permit, including stormwater discharged from transportation
> facilities with vehicle maintenance activity. The site is a water transportation
> facility where mobile fueling and other maintenance activities occur. Stormwater
> and pollutants discharged from the site are "stormwater discharges associated
> with industrial activity" subject to the 33 U.S.C. § 1311(a) prohibition on

---

[7] Although we do not rely on it, the Court finds instructive the Ninth Circuit's recent holding that the "key issue" in three CWA cases "was whether the notice [letter] provided information that allowed the defendant to identify and address the alleged violations, considering defendant's superior access to information about its own activities." *Klamath-Siskiyou Wildlands Center v. MacWhorter*, No. 13-35453, slip op. at 12-13 (9th Cir. Aug 10, 2015). Defendants argue that *Klamath* should be disregarded because it involved the Endangered Species Act, which may contain looser notice requirements than the CWA. *Id.* at 11. However, in referring to the important disparity between a plaintiff and a defendant regarding access to information, the *Klamath* court was specifically relying on CWA cases. *Id.* at 13-16. Therefore, the *Klamath* court's holding is entirely relevant to Soundkeeper's notice letter.

discharges of pollutants without NPDES permit authorization. *See also*, 33 U.S.C. § 1342(P) and 40 C.F.R. § 122.26(a), (b)(14), and (c). (*Id.* at 11.)

Defendants argue that the notice letters required them to conduct a "guessing game" as to what they allegedly did wrong, which the Ninth Circuit has frowned upon. *Ctr. For Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 801 (9th Cir. 2009). But Defendants needed to do no such thing. They were informed of the allegedly violating activities: equipment cleaning (for the Port) and vehicle maintenance (for both Defendants). As we have explained, the Ninth Circuit does not require plaintiffs to allege every specific violation that was actually occurring. *San Francisco BayKeeper*, 309 F.3d at 1158. Notice is sufficient if Defendants "could readily ascertain the nature of the alleged violations, as well as the likely dates of those violations." *Ctr. For Biological Diversity*, 566 F.3d at 802 (internal quotation marks omitted). As we explain below, the Court finds that they could.

Defendants were informed that stormwater discharges from their site were "associated with industrial activity" in violation of 33 U.S.C. § 1311(a) because "mobile fueling and other maintenance [and equipment cleaning] activities" occurred there without an NPDES permit. Defendants were also informed of the specific pollutants that were being discharged, and the days that these discharges were occurring. *See Waterkeepers N. California v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 917-18 (9th Cir. 2004) (finding the dates of a violation in a notice letter sufficient where it alleged that defendant discharged pollutants on every day that there was 0.1 inch of rain). Therefore, Defendants were put on notice that they needed to either obtain an NPDES permit or cease the activities causing stormwater discharges to be associated with

ORDER ON THE PARTIES' FIVE MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 15

1    industrial activity: i.e. vehicle maintenance, including "mobile fueling," and equipment cleaning
2    operations.[8]

3         Defendants also argue that Soundkeeper's notice letters do not include activities in Pier
4    66's service area or involve vessels docked at the cruise terminal.

5         The Court agrees with Defendants that the area to which both notice letters specifically
6    refer is one that is "owned or operated…as a cruise terminal." (Dkt. No. 26 at 10-11 and 38-39.)
7    But the argument that the notice letters did not include vessel-related activities is not well taken.
8    Even though vessels docked at Pier 66 are some distance away from the pier, they are
9    nonetheless located at the "cruise terminal," and are maintained by workers in cherry pickers on
10   the pier. (Dkt. No. 50-1 at 2.) Defendants were therefore on notice of potential "vehicle
11   maintenance" and "equipment cleaning" activities involving vessels docked at Pier 66.[9]

12        However, the Court finds that Defendants are correct in their assertion that the notice
13   letters did not include the service area. As we have explained, discharge from the service area
14   drains to a combined sewer system and does not require a permit. (Dkt. No. 69 at 2 and Dkt. No.
15   13-2 at 41.) Soundkeeper argues that because trucks drive in and out of the service area, they
16   "track out" pollutants to parts of the pier that do not drain to a combined sewer system. But
17   Soundkeeper's notice letters did not remotely indicate that they encompassed "track out" from
18   one part of the pier to another. Reading them, Defendants could have no idea that "track out"

---

[8] As we explain below, the occurrence of regular vehicle maintenance at a facility constitutes a
vehicle maintenance shop so long as it occurs in a fixed location.  *In Re: San Pedro Forklift, Inc.*,
2013 WL 1784788, at *1 (EAB Apr. 22, 2013).

[9] As we explain below, the Court finds that vessel maintenance is vehicle maintenance under the
ISGP and federal regulations. (*See* Dkt. No. 39-1 at 15 (ISGP definition of vehicle does not
exclude vessels)); (Dkt. No. 48-11 at 3 (EPA guidance explaining that water transportation
facilities that perform vessel maintenance contain "vehicle maintenance shops").)

1    was a potential violation that needed to be remedied. *Ctr. For Biological Diversity*, 566 F.3d at

2    802.

3           Defendants' response to the notice letters confirms that they were in fact put on notice of

4    the violations Soundkeeper is now alleging. In determining the sufficiency of notice, the Ninth

5    Circuit considers a defendant's actions subsequent to its reception of a notice letter. *See Natural*

6    *Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 997 (9th Cir. 2000) (accounting for

7    defendant's subsequent actions in determining whether notice was proper in a CWA case).

8           After CTA received its notice letter from Soundkeeper, it "provided the Port with a copy

9    immediately." (Dkt. No. 86 at 8.) One month later, counsel for the Port provided counsel for

10   CTA with a copy of an EPA Industrial Stormwater Fact Sheet ("EPA Fact Sheet"). (Dkt. No. 48

11   at 4.) The EPA Fact Sheet broadly concerns "the NPDES stormwater permitting program for

12   industrial activity," and the "types of industrial facilities [that] are required to obtain permit

13   coverage," among other related topics. (Dkt. No. 48-11 at 3.) A number of different potential

14   sources of pollutants are highlighted or underlined on Defendants' copy of the EPA Fact Sheet,

15   and its metadata indicates that counsel for the Port made these additions before sending the

16   document to counsel for CTA. (Dkt. No. 48 at 4.) The highlighted and/or underlined phrases

17   included "vessel and equipment fluid changes," "painting, fueling, vessel and vehicle exterior

18   washdown," "maintenance and repair areas," and "mobile fueling areas." (Dkt. No. 48-11 at 3,

19   5.) Soundkeeper is currently alleging that Defendants are in violation of the CWA for conducting

20   the following activities in the cruise terminal without an ISGP: vessel maintenance and washing,

21   vessel fluid changes, and vehicle fueling. Each of these activities was underlined or highlighted

22   on the EPA Fact Sheet, indicating that Defendants were aware that it was encompassed by the

23   notice letter.

ORDER ON THE PARTIES' FIVE MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 17

1    Thus, the Court finds that Soundkeeper's notice letters achieved what was required: they

2    gave Defendants the opportunity to correct the violations of which Soundkeeper complained.

3    *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987) (finding

4    that a proper notice letter provides an alleged violator "an opportunity to bring itself into

5    complete compliance with the Act, and thus likewise render unnecessary a citizen suit").

6            **3. Soundkeeper Did Not Need to Allege That the Port "Operated" Pier 66**

7            CTA does not dispute that it was adequately identified in Soundkeeper's notice letter.

8    The Port, however, does.

9            Under EPA regulations, when a facility is owned by one party and operated by another, it

10   is the operator's duty to obtain an NPDES permit. 40 C.F.R. § 122.21. The Port argues that the

11   notice letter needed to state facts alleging that the Port is actually the operator of Pier 66—and

12   therefore required to obtain a permit—in order for it to be liable for any unlawful discharges.

13   (Dkt. No. 52 at 8-9.) But as we have explained, 33 U.S.C. § 1311(a) prohibits "the discharge of

14   any pollutant" into waters of the United States "*by any person.*" (emphasis added). Under the

15   CWA, "any person" can mean any of the following: an "individual, corporation, partnership,

16   association, State, municipality, commission, or political subdivision of a State, or any interstate

17   body." 33 U.S.C. § 1362(5). Therefore, if the Port was indeed responsible for discharging

18   "industrial stormwater and pollutants" at Pier 66 in violation of 40 C.F.R. § 122.26(c)(1), as the

19   notice letter alleges, then it can be sued regardless of whether it was the owner or operator of the

20   facility. [10]

21

22

23

24

25

26   [10] Because Soundkeeper has not yet proven that an ISGP is required for the cruise terminal, we
     need not determine whether the Port or CTA is the proper party to apply for it. Therefore, we do

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

The Port may also be liable if it had sufficient control over the cruise terminal and knowledge of the alleged unpermitted discharges, even if it did not create the discharges itself.[11] *Assateague Coastkeeper v. Alan & Kristin Hudson Farm*, 727 F. Supp. 2d 433, 442 (D. Md. 2010) (finding that the CWA imposes liability on the party who created the discharge and on the party who controlled the discharger). The Port argues that it cannot be liable under this theory because Soundkeeper did not include it in its notice letter. But 40 C.F.R. § 135.3(a) does not require that a notice letter include the plaintiff's specific theory of liability; it is sufficient if it includes enough information for the defendant to remedy the alleged violations. *San Francisco BayKeeper*, 309 F.3d at 1158. As we have explained, Soundkeeper's notice letters provided information sufficient for this purpose.

In addition, the Court finds that the Port's Service Area Field Guide ("Field Guide"), which it created shortly after Soundkeeper filed its complaint against CTA, (Dkt. No. 84 at 2), demonstrates that it was aware that it could be liable for unpermitted discharges committed by others. The Field Guide instructs its recipients to report any Pier 66 tenants who are conducting "vehicle maintenance activities" or "equipment cleaning operations." (Dkt. 83-4 at 3 ("Seaport tenants independently operate their own businesses; however tenant actions can still have consequences for the Seaport.").) Even though the Port issued the Field Guide before it received its notice letter, it had already seen CTA's notice letter and was aware of the allegations in it. (Dkt. No. 86 at 8 and Dkt. No. 48-11 at 3, 5.) Therefore, the Court is not persuaded by the Port's

---

not now decide whether the Port or CTA is the facility's operator according to 40 C.F.R. § 122.21(b).

[11] As we explain in greater detail at the end of this Order, the Court finds that both the Port and CTA did possess the requisite level of control and knowledge to be liable for unpermitted discharges at the cruise terminal, even if they did not create these discharges themselves.

1   argument that, when it ultimately received Soundkeeper's notice letter, it was unaware that it

2   could also be liable for the discharges of its tenants.

**4. CTA's Request to Strike Allegations Not Included in the Notice Letters Is Granted in Part**

5       CTA argues that if Soundkeeper's notice letters are deemed sufficient, the Court should

6   nonetheless strike any activities identified in the complaint that were not in the notice letters.

7   According to Ninth Circuit precedent, a plaintiff may not pursue any alleged violations that were

8   not included in its notice letter. *See San Francisco BayKeeper*, 309 F.3d 1157 (9th Cir. 2002)

9   ("The district court limited BayKeeper's ability to pursue certain alleged violations because it

10  found that BayKeeper's notice letter did not adequately notify Tosco of the nature of those

11  violations.").

13      CTA requests that the Court strike "equipment cleaning operations" from Soundkeeper's

14  complaint, as well as the language "any and all additional violations of the CWA which occurred

15  after those described in Plaintiff's Notice Letter." (Dkt. No. 38 at 21.) The Court grants the

16  former request as to CTA only, and denies the latter.

18      In its notice letter to CTA, Soundkeeper failed to identify "equipment cleaning

19  operations" as an activity that was allegedly occurring at the cruise terminal. (Dkt. No. 26 at 11.)

20  Although Soundkeeper did put the Port on notice of this alleged violation, this did not remedy its

21  failure to notify CTA. *Washington Trout v. McCain Foods, Inc.*, 45 F.3d 1351, 1354 (9th Cir.

22  1995) ("[T]he notice requirements set forth in the regulation must be satisfied before the case

23  may be heard in federal district court."). Therefore, the Court will not find CTA liable for any

24  equipment cleaning operations that occur at the cruise terminal; however, we may still find the

25  Port liable, as it was properly notified of this activity.

26

ORDER ON THE PARTIES' FIVE MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 20

1    The Court declines to strike the language in the complaint regarding future violations. In

2  addressing "additional violations," Soundkeeper does not appear to be referring to activities

3  other than those identified in its notice letters—i.e. vehicle maintenance and equipment

4  cleaning—but rather to any additional occurrences of those activities after the notice letter was

5  sent. CWA citizen suits address only ongoing violations; therefore Soundkeeper may include

6  good-faith allegations regarding ongoing violations of the type contained in its notice letter.

7  *Gwaltney of Smithfield*, 484 U.S. at 64 ("[W]e agree that § 505 confers jurisdiction over citizen

8  suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent

9  violation.").

10

11    In addition, the Court finds that Soundkeeper may not pursue its claims regarding "track

12  out" from the service area. Because Soundkeeper did not sufficiently notify Defendants of this

13  alleged violation in its notice letters, it is barred from alleging it now. *San Francisco Baykeeper*

14  *v. Levin Enterprises, Inc.*, 12 F. Supp. 3d 1208, 1233 (N.D. Cal. 2013) ("[T]he commingling of

15  discharges from Permit-covered activities with those from activities where no Permit coverage is

16  required [] was not mentioned in the Notice Letter. A failure to comply with the statute's notice

17  requirements means that the Court lacks jurisdiction to hear the claim.").

18

19    Finally, the Court notes that the anticipatory claims in Soundkeeper's notice letter have

20  been mooted. (*See* Dkt. No. 26 at 11, 39 ("Should [Defendants] have or obtain 2010 Permit

21  coverage for the facility…").) Soundkeeper does not dispute this. (Dkt. No. 62 at 19-20.) The

22  latter part of Soundkeeper's notice letters was premised on the possibility that Defendants would

23  obtain an ISGP but still be in violation of the CWA. Because Defendants never obtained an

24  ISGP, these sections are, as Soundkeeper admits, irrelevant to the current suit.

25

26    **E. An ISGP Might Be Required for the Cruise Terminal**

An ISGP is only required for facilities that discharge stormwater directly related to industrial activities. (Dkt. No. 39-1 at 3); (*see also* Dkt. No. 39-1 at 14) (defining "stormwater discharge associated with industrial activity").) The two industrial activities potentially at issue here are vehicle maintenance shops and equipment cleaning operations. (Dkt. No. 26 at 10-11 and 38-39.) Defendants argue that they aren't required to obtain an ISGP, and therefore have not discharged any pollutants, because there are no vehicle maintenance shops or equipment cleaning operations at the cruise terminal. As we explain below, the Court finds that there is at least one vehicle maintenance shop and equipment cleaning operation at the cruise terminal—and possibly more than one. However, a genuine dispute of material fact exists as to whether these activities create discharges from the cruise terminal's stormwater drainage system, which would require a permit, or directly into Elliot Bay, which would not.

First, we must define "vehicle maintenance shop" and "equipment cleaning operation." Despite Defendants' arguments to the contrary, the Court finds that these are both ambiguous terms. Because they are ambiguous, EPA's own interpretation of them is "entitled to deference," *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000), so long as this interpretation is not "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted).

In a final decision, EPA's Environmental Appeals Board (the "Board") defined both terms as follows:

> "[V]ehicle maintenance shop" in the storm water regulations refers to a nontransient area or location that is designated for use for vehicle maintenance or in which vehicle maintenance is conducted on a regular or repeated basis, including intermittently or sporadically. The Board holds further that the term, "equipment cleaning operations" in the storm water regulations refers to cleaning of industrial equipment anywhere on a facility's site pursuant to a business

ORDER ON THE PARTIES' FIVE MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 22

process or practice for equipment cleaning. *In Re: San Pedro Forklift, Inc.*, 2013 WL 1784788, at *1 (EAB Apr. 22, 2013).

The Court finds these definitions to be reasonable, and adopts them in full. The Court also finds the Board's guidance as to the particulars of vehicle maintenance shops to be reasonable, and adopts it as well. As the Board explained, a vehicle maintenance shop does not have to be indoors; one can be outdoors as long as vehicle maintenance is regularly conducted there. *Id.* at 20. In addition, the Board found that "[v]ehicle maintenance refers to the rehabilitation, mechanical repairing, painting, fueling, and lubricating of instrumentalities of transportation located at the described facilities." *Id.* at 13.

The Court also chooses to adopt the Board's detailed guidance regarding equipment cleaning operations. The Board found that "cleaning" means to wash "with any aqueous liquid medium," *id.* at 28, and that equipment cleaning includes "vehicle exterior washdowns." *Id.* at 15. The Board also held that a business practice of "equipment cleaning operations" can be established implicitly through "regular or repeated washing of vehicles after use or as they become dusty." *Id.* at 21. And once such an operation has been established, "any incident of cleaning pursuant to that process or practice would be subject to the permitting requirements of the storm water regulations." *Id.* at 23.

Now that we have defined vehicle maintenance shops and equipment cleaning operations, we must determine whether either or both exist at the cruise terminal.

### 1. Activities That Might Require an ISGP

As described below, the Court finds that vessel cleaning and maintenance activities— potentially including bulk lubricant transfer—that leave residue on the cruise terminal might constitute a vehicle maintenance shop or equipment cleaning operation. The Court also finds that

attaching canisters of fuel to the cranes on the cruise terminal might constitute the vehicle maintenance activity of "fueling." We discuss each of these activities in turn. [12]

### a. Vessel Cleaning and Maintenance

Soundkeeper argues that the vessel cleaning and maintenance activities that occur at the cruise terminal are industrial activities that require ISGP coverage, because they allegedly create discharge that falls on the cruise terminal and drains through its stormwater system. Defendants counter that because all of the vessels that dock at the cruise terminal are either covered under a Vessel General Permit (VGP) or are exempt from coverage, any discharges incidental to the normal operation of a vessel do not require an ISGP. [13]

The Court agrees that the VGP does indeed cover discharges incidental to the normal operation of a vessel, for example discharges related to washing or painting. (Dkt. No 39-3 at 9, 24-25). Therefore, the Court finds that an ISGP is not required for any incidental discharges *directly into* Elliot Bay from vessels that have obtained a VGP.

CTA argues that "the ISGP expressly states that facilities that have coverage under another NPDES general permit cannot also be subject to ISGP coverage." (Dkt. No. 38 at 12.) The Court agrees. (Dkt. No. 39-1 at 7 (exempting from ISGP coverage "[a]ny facility authorized to discharge stormwater associated with industrial activity under an existing NPDES individual or other general permit").) However, Soundkeeper is not arguing that *the vessels* that dock at the

---

[12] Because Soundkeeper did not provide sufficient notice that "track out" from the service area was one of Defendants' alleged violations, we do not consider it here. *San Francisco Baykeeper*, 12 F. Supp. 3d at 1233.

[13] Soundkeeper argues that Defendants have failed to prove that all vessels that dock at the cruise terminal have either obtained a VGP or are exempt from coverage. (Dkt. No. 80 at 1-2). Because this dispute does not relate to the outcome of this Order, the Court need not resolve it at this time.

1    cruise terminal require an ISGP for their discharges. Instead, it is arguing that *the cruise terminal*

2    *itself* requires one for any vessel discharges associated with industrial activity that fall on the

3    cruise terminal and are drained through its stormwater system. This is plainly correct. Even

4    though the VGP covers all incidental discharges from a vessel, it does not cover incidental

5    discharges from land-based facilities that work on vessels. [14] (Dkt. No. 39-3 at 9 (listing "Vessel

6    Discharges Eligible for Coverage")); (*see also* Dkt. No. 44-1 at 13 (explaining that vessel

7    cleaning that occurs when a vessel is in dry dock is not covered by the VGP and requires a

8    separate NPDES permit).) As Soundkeeper points out, the VGP explicitly states that

9    "[d]ischarges that are outside the scope of the former exclusion from NPDES permitting for

10   discharges incidental to the normal operation of a vessel as set out in 40 CFR §122.3(a), as in

11   effect on December 18, 2008, are ineligible for coverage under this permit." (Dkt. No. 39-3 at

12   11.) Section 122.3(a) previously excluded "any…discharge incidental to the normal operation of

13   a vessel." *Final National Pollutant Discharge Elimination System (NPDES) General Permit for*

14   *Discharges Incidental to the Normal Operation of a Vessel*, 73 Fed. Reg. 79473, 79476-77 (Dec.

15   29, 2008). It did not exclude discharges from land-based facilities. *Nw. Envtl. Advocates v.*

16   *E.P.A.*, 537 F.3d 1006, 1011 (9th Cir. 2008) (quoting the previous exclusion in 40 CFR

17   §122.3(a)). Therefore, discharges from a land-based facility are "outside the scope of the former

18   exclusion" and are not covered by the VGP.

19

20

21   _____

22   [14] CTA points out that according to the ISGP, a "general permit" is one that "covers multiple
     dischargers of *a point source category* within a designated geographical area." (Dkt. No. 39-1 at
23   10 (emphasis added).) Therefore, according to CTA, the VGP also covers discharges from the
     cruise terminal itself. But the vessels that dock at the cruise terminal and possess VGP coverage
24   are *separate* point sources from the cruise terminal's stormwater drainage system, so this
     argument is unavailing. *See* 33 U.S.C. § 1362(14) (identifying "vessel[s] or other floating craft"
25   as point sources).

26

Soundkeeper asserts that when vessels are washed, painted, rust-proofed, or otherwise maintained alongside the cruise terminal, some of the residue from these activities can end up on the cruise terminal itself.[15] Soundkeeper admits that the vessels are 12-14 feet away from the side of the cruise terminal whenever these activities occur. (Dkt No. 73 at 14). However, Soundkeeper argues that the workers performing these activities are sometimes stationed directly above the cruise terminal. Barbara Flye, one of Soundkeeper's declarants, testified that she observed workers painting a vessel from a cherry picker "right next to and above" the cruise terminal and saw no protective drop cloth or tarp over its surface. (Dkt. No. 50 at 2.) Flye also provided pictures of a worker standing on a cherry picker and painting a vessel. (Dkt. No. 50-1 at 2.) In one picture, the worker appears to be standing directly over the cruise terminal itself with no protective drop cloth underneath. (*Id.*)

CTA disputes that residue from vessel cleaning or maintenance falls on the cruise terminal. However, Jean Cox, General Manager of CTA, testified that it is possible that this could happen. (Dkt. No. 72-9 at 13-14 (admitting the possibility that excess paint from vessel painting could fall on the pier).) And Soundkeeper's expert Richard Horner testified that he is certain it happens. (Dkt. No. 73 at 14.) The Court therefore finds that a genuinely disputed issue

_____

[15] Soundkeeper also argues that because these activities take place *at* the cruise terminal, it need not prove that they actually cause stormwater discharge *from* the cruise terminal, since it is enough that they are "associated" with the cruise terminal and CWA liability is strict. However, because the VGP covers direct discharges from vessel maintenance and cleaning, if none of the residue from these activities discharges from the cruise terminal, then, by definition, they are covered by the VGP and do not require an ISGP. (Dkt. Nos. 39-3 at 9 and 39-1 at 7.) In addition, to require an ISGP, stormwater "directly related" to industrial activities must drain from the cruise terminal's stormwater system. (Dkt. No. 39-1 at 14.) Therefore, Soundkeeper must prove that at least *some* residue from vessel-related industrial activities is discharged from the cruise terminal.

1    of material fact exists as to whether residue from vessel maintenance and cleaning activities falls

2    on the cruise terminal.[16]

3        Defendants argue that whether such residue falls on the pier is irrelevant, because "vessel

4    maintenance" is not "vehicle maintenance" and cannot constitute a "vehicle maintenance shop."

5    But Soundkeeper points out that the EPA Fact Sheet states that "water transportation facilities

6    with vehicle maintenance shops and/or equipment cleaning operations….include[] water

7    transportation facilities that perform vessel and equipment fluid changes, mechanical repairs,

8    parts cleaning, sanding, blasting, welding, refinishing, painting, fueling, vessel and vehicle

9    exterior washdown." (Dkt. No. 48-11 at 3.) This supports Soundkeeper's assertion that vessel

10   maintenance is vehicle maintenance and would require a permit.

11

12       However, Defendants assert that the EPA Fact Sheet is irrelevant to vessel discharges,

13   because it was issued before the VGP existed, at a time when there was no applicable permit for

14   discharges from a vessel. But as we have explained, the VGP covers all incidental discharges

15   from a vessel; it does not cover incidental discharges from land-based facilities that work on

16   vessels. (Dkt. No. 39-3 at 9.) And as the EPA Fact Sheet makes clear, its guidance relates only to

17

18   _____

19   [16] CTA may therefore be incorrect when it asserts that "[t]he vessel related activities identified
20   by PSA do not generate stormwater." (Dkt. No. 38 at 10.) If residue from these activities falls on
     the cruise terminal, then it may discharge from its stormwater drainage system, triggering the
21   requirement for an ISGP. (Dkt. No. 39-1 at 3.) Defendants argue that this holding will make
     neighboring facilities liable if some residue is blown onto their property. Defendants miss the
22   point. An ISGP must be obtained for "facilities conducting industrial activities that discharge
     stormwater;" moreover, this stormwater must be "directly related" to the industrial activities
23   conducted. (*Id.* at 3, 14.) Therefore, Defendants will be liable if residue from vessel-related
     maintenance and/or cleaning that takes place at the cruise terminal also discharges from the
24   cruise terminal. But because the activities that create *this specific residue* take place at the cruise
     terminal and not neighboring facilities, these facilities should not be liable even if some residue
25   is blown onto their property. In any case, because the liability of neighboring facilities is not
     directly at issue here, it need not overly influence our ruling.
26

discharges from land-based facilities rather than from vessels directly into the water. (Dkt. No. 48-11 at 3 ("This fact sheet specifically discusses stormwater discharges from water transportation facilities.").) Because the EPA Fact Sheet only covers discharges from land-based facilities, and the VGP only covers discharges from vessels, the Court finds that the EPA Fact Sheet has not been superseded by the VGP. The EPA Fact Sheet is therefore instructive in determining the scope of the terms "vehicle maintenance shop" and "equipment cleaning operations," which the Court has already explained are ambiguous terms, and which could reasonably include vessel maintenance and cleaning.  By listing vessel maintenance and cleaning activities as part of vehicle maintenance shops and equipment cleaning operations, the EPA Fact Sheet clarifies that these terms encompass vessel-related activities. Because the Court finds this interpretation reasonable, it is entitled to significant deference. *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1214 (9th Cir. 2009) ("[An] agency is entitled to further deference when it adopts a reasonable interpretation of regulations it has put in force.").

The text of the ISGP further supports Soundkeeper's argument. The ISGP defines "vehicle maintenance" as "the rehabilitation, mechanical repairing, painting, fueling, and/or lubricating of a motor-driven conveyance that transports people or freight, such as an automobile, truck, train, or airplane." (Dkt. No. 39-1 at 15.) This definition could include vessels, which are "motor-driven conveyances that transport people or freight," and are not specifically excluded. If the drafters of the ISGP intended to exclude vessels they would have said so, as the ISGP regulates water transportation facilities. (*See* Dkt. No. 39-1 at 4 (including "water transportation" facilities in a list of regulated activities).) In fact, the drafters explicitly excluded "vessel sewage transfers" from requiring coverage under the ISGP. (Dkt. No. 39-1 at 11.) This suggests that they were aware they would need to specifically exclude vessels if this was their

intention. Thus, because vessels are not specifically excluded from the ISGP definition of "vehicle maintenance," it is likely that this definition was intended to include vessels as well.

The Court therefore finds that the area at the cruise terminal where vessels are washed and painted is a vehicle maintenance shop and equipment cleaning operation, because vessel maintenance and cleaning activities regularly occur there and will continue to occur. (Dkt. No. 55 at 1.) If residue from these activities falls on the cruise terminal and is discharged via its stormwater drainage system, then this is discharge that requires an ISGP. (Dkt. No. 39-1 at 3.) However, as explained above, there is a genuine dispute of material fact as to whether such residue actually falls on the cruise terminal.

**b. Bulk Lubricant Transfer**

Thousands of gallons of petroleum-based lubricant are regularly transferred from trucks on the cruise terminal, through hoses, and into docked vessels for storage. (Dkt. No. 75 at 2 (explaining the procedure for deliveries)); (Dkt. No. 48-3 and -4 (listing delivery dates and amounts)); (Dkt. No. 55 at 1 (admitting that delivery of lubricant has occurred and will likely continue to occur).) Soundkeeper argues that this activity is either "lubrication" or a "vessel fluid change" (or both), each of which might qualify as vehicle maintenance. Defendants argue that this activity is not lubrication and is not otherwise vehicle maintenance, however they do not specifically address whether it constitutes a vessel fluid change. The Court agrees with Defendants in part, but is unable to fully resolve the matter at this time.

As Soundkeeper points out, "lubrication" is listed as a type of vehicle maintenance in 40 C.F.R. § 122.26(b)(14)(viii). But when lubricant is transferred into waiting vessels, the vessels themselves aren't being lubricated. (Dkt. No. 96 at 6.) Instead, the lubricant is being stored for future use. (*Id.*) The EPA has explained that the delivery of a petroleum product—which

1    includes lubricant (*Id.*)—does not constitute "fueling." (Dkt. No. 95-4 at 3.) By the same logic,

2    the Court finds that the delivery of lubricant for later use does not constitute lubrication under §

3    122.26(b)(14)(viii).

4          Soundkeeper also argues that bulk lubricant transfer is a "vessel fluid change," which the

5    EPA Fact Sheet includes in its list of vehicle maintenance activities. (Dkt. No. 48-11 at 3.)

6    Defendants counter that there is a separate NPDES classification, SIC 5171, that applies to

7    petroleum bulk stations and terminals "where frequent bulk transfers of petroleum products

8    occur[]." (Dkt. No. 96 at 6-7.) In order for a SIC 5171 facility to be required to obtain an NPDES

9    permit for discharges associated with industrial activity, it must have a vehicle maintenance

10   shop, equipment cleaning operation, or airport deicing operation. 40 CFR 122.26(b)(14)(viii). In

11   other words, Defendants argue that because petroleum bulk stations—where petroleum deliveries

12   frequently occur—do not automatically contain vehicle maintenance shops, then delivering

13   petroleum-based lubricant to a vessel cannot in itself constitute a vehicle maintenance shop. But

14   because the EPA Fact Sheet specifically identifies "*vessel* fluid changes," it is possible that the

15   EPA has chosen to regulate bulk transfers of petroleum products differently in different contexts.

16          Regardless, such discussion is purely academic at this point, as the Court is currently

17   unable to determine whether the delivery of lubricant to a vessel constitutes a "vessel fluid

18   change." Therefore, this discrete issue must remain unresolved for the time being.

19

20                              **c. Fueling Cranes on the Cruise Terminal**

21          There are several cranes on the cruise terminal that SSA Pacific, a stevedoring company

22   that is a joint-venture partner in CTA, operates and maintains. (Dkt No. 87 at 1-2.) In the past,

23   SSA Pacific may have fueled these cranes from a truck that was brought onto the cruise terminal.

24   (*Id.* at 2.) However, it has not fueled its cranes in this manner since September 2013. (*Id.* at 3.)

ORDER ON THE PARTIES' FIVE MOTIONS FOR
SUMMARY JUDGMENT

1   Now SSA Pacific fuels its cranes by detaching a sealed canister from each, filling these with fuel

2   offsite, and then reattaching them at the cruise terminal. (*Id.* at 3.) This method is used to refill

3   two cranes every week when they are in operation. (Dkt. No. 72-7 at 18.) Richard Horner,

4   Soundkeeper's expert in stormwater management, asserts that even though the risk is lower, this

5   method could still cause fuel to discharge to the cruise terminal. (Dkt. No. 73 at 13.)

6       The issue before us is whether this method of providing fuel to the cranes constitutes the

7   industrial activity of "fueling." § 122.26(b)(14)(viii). If it does, and if it occurs in a relatively

8   fixed location, then this activity constitutes a vehicle maintenance shop: the CWA regulations

9   specifically include "fueling" as a vehicle maintenance activity, *id.*, and the cranes are regularly

10  fueled. But the Court finds that, at present, it does not have sufficient information to determine

11  whether this is indeed "fueling." Therefore, we do not now decide whether Defendants are liable

12  for this activity.

13

14          **2. Activities That Do Not Require an ISGP**

15      Defendants admit that the following activities occur on the cruise terminal: sewage and

16  bilge water transfers from vessels, (Dkt. Nos. 55 at 1 and 72-6 at 8), emergency vehicle repairs,

17  (Dkt. No. 72-5 at 23), and maintenance on the motor-driven gangway. (Dkt. No. 72-5 at 31-33.)

18  However, they deny that these are industrial activities requiring ISGP coverage. As we explain

19  below, the Court agrees.

20

21          **a**. **Sewage and Bilge Water Transfers**

22      Defendants argue that sewage transfers and the removal of oily bilge water from vessels

23  do not require ISGP coverage. Defendants are correct. In the CWA's definition of pollutant,

24  "sewage from vessels" is specifically excluded. § 1362(6)(a). The EPA Fact Sheet similarly

25  exempts bilge water and sanitary wastes originating from vessels from requiring coverage under

26

an industrial stormwater permit. (Dkt. No. 48-11 at 1 ("Bilge and ballast water, sanitary wastes, pressure wash water, and cooling water originating from vessels are not covered under the industrial stormwater program.").) And as we have explained, the ISGP itself also excludes "sewage from vessels" under its definition of pollutant. (Dkt. No. 39-1 at 11.) Therefore, the Court finds that sewage and bilge water transfers from vessels do not require ISGP coverage.

### b. Emergency Vehicle Repairs

Defendants have admitted that at least once per year a vehicle is repaired on the cruise terminal itself, rather than being taken offsite. (72-5 at 24-25.) Soundkeeper argues that these repairs constitute a vehicle maintenance shop. But it is clear from Defendants' testimony that these activities do not "regularly" occur in a "fixed" location. (*Id.*) Therefore, they do not create a vehicle maintenance shop. *In Re: San Pedro Forklift, Inc.*, 2013 WL 1784788, at *1.

### c. The Gangway

Soundkeeper argues at length that the servicing of the cruise terminal gangway is vehicle maintenance activity. Although this is a closer issue, the Court disagrees. The CWA does not define vehicle, however the EPA has defined vehicle maintenance as "the rehabilitation, mechanical repairing, painting, fueling, and lubricating of instrumentalities of transportation located at the described facilities." *National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges*, 55 Fed. Reg. at 48013. The ISGP does define vehicle: "Vehicle means a motor-driven conveyance that transports people or freight, such as an automobile, truck, train, or airplane." (Dkt. No. 39-1 at 15.) The gangway does not fit under either of these definitions.

The gangway consists of two separate structures: the AB section and the CD section. (Dkt. No. 96 at 5.) When both sections are attached, they form the raised walkway that

ORDER ON THE PARTIES' FIVE MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 32

1    passengers traverse to board vessels docked at the cruise terminal. (*Id.*) The AB section is a

2    relatively flat platform that cannot be raised or lowered. (*Id.*) The CD section can be raised or

3    lowered, allowing passengers to board vessels whether the tide is in or out. (*Id.*) However, the

4    CD section does not move while people are standing on it. (*Id.*) At the end of the cruise season,

5    the sections are separated and moved to the north end of Pier 66. (*Id.*) The AB section is pulled

6    to the storage location by forklifts. (*Id.*) The CD section is motorized and moves under its own

7    power. (*Id.*) However, no one sits inside the CD section while it moves. (*Id.*). Instead, Port

8    

9    employees walk alongside the CD section to control and guide it as it moves. (*Id.*)

10        Even though the gangway has a motor, it is not an "instrumentality of transportation."

11   *National Pollutant Discharge Elimination System Permit Application Regulations for Storm*

12   *Water Discharges*, 55 Fed. Reg. at 48013. The word "instrumentality" indicates that the EPA

13   intended "vehicle" to be something that is used as a means for transportation, rather than

14   something that merely transports itself. *Instrumental Definition*, MERRIAM-WEBSTER.COM,

15   http://www.merriam-webster.com/dictionary/instrumental (last visited November 16, 2015)

16   (defining "instrumental" as "serving as a crucial means, agent, or tool"). The gangway is not

17   used as a means for transportation: the only time it "transports" anyone is when they walk across

18   it. But then it is just a bridge, which is clearly not a vehicle. *Griffin v. Oceanic Contractors, Inc.*,

19   458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are

20   

21   to be avoided if alternative interpretations consistent with the legislative purpose are available.").

22        Soundkeeper seems to argue that because the gangway is a motor-driven conveyance, and

23   also acts as a stationary bridge that people walk across, it fits under the ISGP definition of

24   "vehicle." However, not only would this reach an impermissibly absurd result, *id.*, it is also

25   contrary to the plain meaning of the text. *Caminetti v. United States*, 242 U.S. 470, 485 (1917)

26

(holding that a court must adhere to a law's plain meaning). The natural reading of the ISGP definition is that it covers only those conveyances that transport people or freight *through the use of a motor*. Soundkeeper's proposed interpretation stretches the language of the ISGP past its breaking point.

The Court therefore agrees with Defendants: because the gangway only uses its motor to transport itself, it is not a vehicle under the EPA and ISGP definitions. And because the gangway is not a vehicle, any maintenance conducted on it does not constitute a vehicle maintenance shop. § 122.26(b)(14)(viii).[17]

**F. Activities That Might Violate the CWA Are Ongoing at the Cruise Terminal**

A defendant is only liable for ongoing violations of the CWA; citizen suits cannot be premised on violations that have occurred entirely in the past. *Gwaltney of Smithfield*, 484 U.S. at 64. "[A] citizen plaintiff may prove ongoing violations either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 998 (9th Cir. 2000) (internal quotation marks omitted). The Ninth Circuit clarified that "[i]ntermittent or sporadic violations do not cease to be ongoing until the date when there is *no real likelihood of repetition*." *Id.*

---

[17] Soundkeeper argues that according to the EPA Fact Sheet, "equipment fluid changes" on the gangway are "industrial activities," (Dkt. No. 48-11 at 1), and therefore create liability. But this is true only if they are conducted as part of a vehicle maintenance shop. § 122.26(b)(14)(viii). First, Soundkeeper must prove that the crane-canister fueling or vessel maintenance that occurs at the cruise terminal constitutes a vehicle maintenance shop. Then, if equipment fluid changes are indeed performed on the gangway within this maintenance area, they may be "industrial activities." But we cannot and need not determine this at present.

ORDER ON THE PARTIES' FIVE MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 34

1    Defendants argue that Soundkeeper's claims should be dismissed because Defendants are

2 not currently in violation of the CWA. However, CTA has admitted that vessel maintenance and

3 cleaning activities, as well as bulk lubricant transfers, will continue to occur at the cruise

4 terminal. (Dkt. No. 55 at 1.) As we have explained, if the former activity causes residue to

5 discharge from the cruise terminal, and if the latter activity is deemed to be a vessel fluid change,

6 then these are ongoing violations. CTA also admits that cranes continue to be "fueled" at the

7 cruise terminal, albeit via a new method. (Dkt. No. 87 at 3.) If this method is deemed to

8 constitute "fueling," then this too is an ongoing violation. Because multiple alleged vehicle

9 maintenance and cleaning activities are ongoing, the Court need not determine at this time

10 whether other, purportedly ceased activities are reasonably likely to recur.

11

12    Soundkeeper also argues that their amended complaint relates back to the filing of their

13 initial complaint against CTA. They make this argument in order to include any vehicle

14 maintenance activity that the Port may have engaged in—and then ceased—at the service area

15 between the time of Soundkeeper's first complaint and when the Port adopted the Field Guide.

16 (Dkt. No. 91 at 19-20.) We have already explained that we need not consider Soundkeeper's

17 allegations regarding "track out" from the service area because this activity was not included in

18 its notice letters. Therefore, the Court need not determine at this time whether Soundkeeper's

19 amended complaint relates back.[18]

20

21

22 _____

23 [18] Soundkeeper points out that if the Port is ultimately found liable, then whether the amended

24 complaint relates back will be relevant to determining the extent of the Port's liability for
violations that occurred outside the service area. In other words, if the amended complaint relates

25 back, then the Port would be liable for activities that occurred over a longer period of time. But
the Port has not yet been found liable, so at this point we need not determine the scope of its

26 potential liability.

ORDER ON THE PARTIES' FIVE MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 35

**G. Defendants' Knowledge of and Ability to Control the Activities at the Cruise Terminal Determines Their Potential Liability**

Defendants argue that they did not directly cause any of the alleged unpermitted discharges, and therefore should not be liable under § 1311. But "the CWA imposes liability both on the party who actually performed the work and on the party with responsibility for or control over performance of the work." *Assateague Coastkeeper*, 727 F. Supp. 2d at 442 (collecting cases in which the defendant was liable for an activity it controlled or was responsible for but in some instances did not perform); *see also United States v. Gulf Park Water Co.*, 972 F. Supp. 1056, 1063 (S.D. Miss. 1997) ("The ability to control the facility, coupled with knowledge of the violation, is also sufficient to impose liability under the CWA.").[19] Therefore, neither the Port nor CTA needs to have actually caused any discharges at the cruise terminal; they may both be liable so long as each possesses sufficient control over the facility and knowledge of the alleged violations. *See Gulf Park Water*, 972 F. Supp. at 1063-64 (finding multiple defendants liable under this theory). The Court finds that they do.[20]

---

[19] Defendants argue that *Gulf Park Water* is not relevant to the matter at hand because it concerned the liability of individual employees. In *Gulf Park Water*, the court found that Gulf Park Water Co. was liable under the CWA for unpermitted discharges. *Gulf Park Water*, 972 F. Supp. at 1061. Once this was established, the court then addressed whether certain individuals could be liable for these discharges. *Id.* at 1063-64. The court found that they could be so long as each exercised sufficient control over the facility. *Id.* The question presented in *Gulf Park Water* is therefore logically indistinguishable from the one in the instant case. Just as in *Gulf Park Water*, there are multiple "persons" who may be liable for the alleged discharges from the cruise terminal. Only here, the persons in question are a limited liability corporation (CTA), (Dkt. No. 10 at 1), and a public commission (the Port), *About the Port*, PORT OF SEATTLE, https://www.portseattle.org/About/Commission/Pages/default.aspx. *See* 33 U.S.C. § 1362 (including "corporations," "commissions," and "political subdivisions of a State" under the definition of "person").

[20] CTA argues that because its lease with the Port forbids it from conducting "industrial activity" as that term is used in the ISGP, it cannot be liable if any such activity has occurred. (Dkt. No.

CTA manages and coordinates vessel activities at the cruise terminal. (Dkt. No. 88-2 at 3, 28.) If a vessel intends to conduct any maintenance or obtain lubricant at the cruise terminal, it must submit a scope-of-work form to CTA. (Dkt. No. 47 at 2.) CTA is also responsible for vessel scheduling and invoicing, (Dkt. No. 88-2 at 3), and for admitting vendors and contractors to the cruise terminal. (Dkt. No. 80-10.) Under its lease with the Port, CTA must ensure that third parties comply with "all Legal requirements," (Dkt. No. 13-1 at 57), which the Port understands to include environmental laws. (Dkt. No. 72-3 at 11.) To this end, CTA is able to monitor the cruise terminal via surveillance cameras, which it uses for security purposes and to "see if things are being implemented properly." (Dkt. No. 72-9 at 12.) CTA and the Port agree that CTA can issue stop work orders for activities that are being improperly performed. (Dkt. No. 72-3 at 10 and Dkt. No. 72-6 at 12) (Port declarants stating that CTA can issue stop work orders)); (Dkt. No. 72-9 at 11-12 (CTA declarant stating that CTA can issue stop work orders).) CTA was aware that vessel maintenance and washing, (Dkt. No. 55 at 1), bulk lubricant transfers, (*id.*), and crane "fueling" occur at the cruise terminal. (Dkt. No. 87 at 2-3 (describing how a Port of Seattle consultant recommended that CTA obtain ISGP coverage for Pier 66 because of the vehicle fueling that occurred at Pier 66, which caused SSA Pacific to change its crane-fueling method).) For all of the above reasons, the Court finds that CTA had control over the cruise terminal and was aware of the alleged violations.

---

10-1 at 27.) But whether the lease forbids industrial activity is largely irrelevant to CTA's potential liability. If stormwater discharges associated with industrial activity have occurred at the cruise terminal, and if CTA either caused these discharges or had sufficient knowledge of and control over these discharges, then it is liable regardless of whether the lease prohibited this activity. Moreover, as we will explain, the lease also gave CTA the power to stop prohibited activities. (Dkt. Nos. 13-1 at 57 and 72-3 at 11.) Therefore, CTA cannot hide behind the language of the lease.

Under its lease to CTA, the Port retains the right to enter the cruise terminal and bring it into compliance with environmental law. (Dkt. No. 10-1 at 42.) Marie Ellingson, manager of cruise services for the Port, testified that the Port has the ability "[t]o intervene should there be activity on the pier that should be regulated." (Dkt. No. 72-3 at 12.) The fact that the Port issued its Field Guide prohibiting certain activities—including tenant activities—at Pier 66 makes clear that it has sufficient control over the facility to stop violations from occurring. (Dkt. No. 83-4 at 2.) CTA must also allow the Port access to the cruise terminal to conduct annual environmental inspections, and to conduct environmental testing at any time following reasonable notice. (*Id.*) CTA cannot conduct environmental testing on its own without first obtaining the Port's consent. (*Id.*)[21] And as with CTA, vessels that intend to conduct maintenance activities or receive bulk lubricant at the cruise terminal must submit a scope-of-work form to the Port. (Dkt. No. 49 at 2.) Finally, the Port was aware that vessel maintenance, (Dkt. No. 49 at 2), bulk lubricant transfer, (*id.*), and crane "fueling" were all occurring at the cruise terminal. (Dkt. No. 87 at 3-4.) For all these reasons, the Court finds that the Port also had sufficient control over the cruise terminal and knowledge of the alleged unpermitted discharges.

Therefore, if Soundkeeper can prove that these activities require ISGP coverage, then both CTA and the Port will be liable.[22]

**H. The Court Is Currently Unable to Determine Whether Defendants Are Liable**

---

[21] Although CTA argues that this consent requirement means that it is not the "operator" of the cruise terminal, there is no indication that the Port has ever refused to consent to one of its tenants performing environmental testing. (Dkt. No. 91-1 at 10.)

[22] As explained above, only the Port may be liable for any equipment cleaning operations that might exist at the cruise terminal, since CTA was not properly notified of this activity.

1    The Court cannot yet determine whether Defendants have violated the CWA, because it

2 lacks sufficient information to decide three critical issues. First, whether residue from vessel

3 maintenance and cleaning drains from the cruise terminal's stormwater system. Second, whether

4 transferring bulk lubricant onto vessels docked at the cruise terminal constitutes a "vessel fluid

5 change." And third, whether the cranes on the cruise terminal are currently fueled in a manner

6 that constitutes the industrial activity of "fueling."

7    Defendants have also created a genuine issue of material fact as to the amount of

8 stormwater that is discharged from the cruise terminal. Richard Horton, Soundkeeper's expert,

9 testified that stormwater will discharge from the cruise terminal whenever there is 0.25 inch of

10 rain, and that this occurred on 320 days between January 30, 2009 and June 15, 2015. (Dkt. No.

11 73 at 16.) However, as Defendants point out, Mr. Horton's data is based on an airfield six miles

12 away. (*Id*.) Defendants therefore argue that this data is unreliable, since "[t]here can be

13 differences in precipitation frequency and magnitude within this distance." (Dkt. No. 96 at 11.)

14 The Court agrees with Soundkeeper that any stormwater discharge will create liability, as long as

15 Soundkeeper can prove that it was associated with industrial activity. *Sierra Club*, 813 F.2d at

16 1490–91. But whether and how often the cruise terminal has actually discharged stormwater is

17 currently in dispute.

18 **III. CONCLUSION**

19    For the foregoing reasons, Soundkeeper's motion for partial summary judgment (Dkt.

20 No. 72) and CTA's first motion for summary judgment (Dkt. No. 38) are both GRANTED IN

21 PART AND DENIED IN PART. CTA's second motion for summary judgment (Dkt. No. 86)

22 and both of the Port's motions for summary judgment (Dkt. Nos. 52 and 81) are DENIED.

23    //

ORDER ON THE PARTIES' FIVE MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 39

1

DATED this 20 day of November 2015.

2

3

4

John C. Coughenour
UNITED STATES DISTRICT JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER ON THE PARTIES' FIVE MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 40