THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PUGET SOUNDKEEPER ALLIANCE,<br><br>Plaintiff,<br><br>v.<br><br>CRUISE TERMINALS OF AMERICA,<br>LLC, et al.,<br><br>Defendants. | CASE NO. C14-0476 JCC<br><br>ORDER ENTERING CONSENT DECREE |

THIS MATTER comes before the Court upon the parties' joint stipulated motion for entry of a consent decree (Dkt. No. 121). Having considered the stipulations and the promises and agreements set forth below, the Court ORDERS, ADJUDGES, AND DECREES as follows:

1. The Court has jurisdiction over the parties and subject matter of this action.

2. Each signatory for the parties certifies that he or she is authorized to enter into the agreements set forth below for that party.

3. This Consent Decree applies to the cruise terminal at Pier 66, 2225 Alaskan Way, Seattle, Washington 98121 (the "Facility").

4. This Consent Decree binds Soundkeeper's successors and assigns and any successor owner or operator of the Facility.

5. The parties are concurrently executing an agreement with respect to implementation of best management practices at the cruise terminal at Pier 91, 2001 West Garfield St., Seattle, Washington 98119 ("Pier 91 Agreement"). Certain terms of the Pier 91 Agreement are referenced in this Consent Decree, but the Pier 91 Agreement sets forth the exclusive terms of, remedy for enforcement of, and resolution of disputes arising under the Pier 91 Agreement.

6. This Consent Decree is a full and complete settlement of the claims in the First Amended Complaint and all other claims known and unknown and existing as of the date of entry of this Consent Decree that could be asserted against CTA or the Port under the Clean Water Act, 33 U.S.C. §§ 1251-1387, arising from ownership or operations of the Facility (the "Claims"). The Claims are released and dismissed with prejudice. Enforcement of this decree is Soundkeeper's exclusive remedy for any violation of its terms.

7. This Consent Decree is a settlement of disputed facts and law. It is not an admission or adjudication regarding any allegations by Soundkeeper in this case or of any fact or conclusion of law related to those allegations. It is not an admission by CTA or the Port of any liability and is not evidence of any wrongdoing or misconduct on the part of CTA or the Port.

8. As partial consideration for the releases and settlement of claims as provided herein, the Port agrees that it, its tenant, or a designee will implement the following best management practices (BMPs) for cruise operations at the Facility on Pier 66, after entry of the Consent Decree:

    **a. Fueling and Maintenance:**

        i. No fueling, except for the gangway and cranes which are discussed below, may occur on any portion of the Facility that discharges stormwater to Elliott Bay.

        ii. No maintenance of vehicles may occur on any portion of the Facility that discharges stormwater to Elliott Bay. Maintenance of vehicles includes, but is not limited to, changing lubricating, hydraulic and/or

transmission oil; topping off fluids, changing oil and/or fuel filters, grinding, sanding, welding, mechanical repairs, and/or painting.

iii. For the main passenger gangway system and cranes at the facility:

1. Drip collection pans or other effective containment devices must be placed under equipment that are subject to fluid leaks, including but not limited to areas where fluids are changed and topped off, fuel is added, and fuel tanks are exchanged;

2. Tarps or drop cloths must be placed under equipment being repaired if the equipment is immobile or emergency repairs must be made before it can be removed off-site; and

3. The contents of the containment devices, tarps and/or drop cloths must be collected after each procedure and disposed of in a manner consistent with federal, state and local laws.

**b. Storage of Equipment:**

i. When parked or stored without covered protection from precipitation, drip collection pans or other containment devices are to be placed under any parts of mobile equipment that have petroleum-based materials exposed to precipitation and/or runoff. The containment devices must have sufficient depth and/or capacity to contain any precipitation that enters. The contents of the containment devices must be collected and disposed of in a manner consistent with federal, state, and local laws. These measures must be applied to the following equipment at a minimum:

1. Parts of the main passenger gangway, including but not limited to screw jacks and exposed drive and positioning mechanisms. Drip pans or other effective containment devices must be employed in both the cruise-season and off-season locations.

2. Parts of the cranes including but not limited to gearing and hydraulic oil lines/connections

3. Parts of the fork lifts including but not limited to greased components and hydraulic oil lines/connections.

**c. Product Delivery and Waste Removal:**

i. At the pier, drip collection pans or other effective containment devices must be placed under all hose connections during fluid transfers to and

from ships and at all hose connection points. The contents of the containment devices must be disposed in a manner consistent with federal, state, and local laws.

ii. All hoses used in fluid transfers must be inspected immediately before they are used to transfer fluids and any damaged or flawed hose sections replaced before any transfer. For oil and hazardous material transfers, a record of these inspections, observations made and replacements provided will be kept on the Declaration of Inspection Prior to Bulk Cargo Transfer required by the US Coast Guard under 33 CFR 156.

iii. The following fluid transfer operations at the Facility will be conducted as follows:

1. Lubricating oil deliveries to vessels: The measures in c. i. and ii will be used at each connection point at the delivery trucks, and booms will be installed around oil delivery truck tanks before transfers begin. Storm drains located within the area controlled by the land boom will be protected. The Port will have land boom, drain covers, and drip pans available for vendors.

2. Oily bilge water removal from vessels: The measures in c. i. and ii will be used at each connection point at the removal truck.

3. Sewage removal from vessels: The measures in c. i. and ii will be used at each connection point at any storage tank on the Pier or any removal trucks.

**d.    Vessel Painting and Washing:**

i. Any washing and spraying of the outside of the vessels must be done with clean water.

ii. No spray painting or sand blasting of vessels will occur at the facility.

iii. No mixing of paint or tool cleaning related to vessel painting and washing will occur on portions of the cruise terminal facility that discharge stormwater to Elliot Bay.

iv. Tarps or drop cloths will be used as follows:

1. A tarp or drop cloth will be affixed under or on the floor of any manlift (i.e. cherry picker) basket when using a manlift located on the pier for any painting, paint preparation, finish application or

washing occurs. The floor of the manlift will be inspected for any paint drips or spills and wiped before removing the tarp or drop cloth from beneath.

2. In addition to a tarp affixed under or on the floor of the manlift, it will be recommended to the vessel operators to exercise additional caution to prevent the discharge of paint drips and paint chips directly in to the water, and in so doing consider the design, installation and use of any drop cloth device attached to the vessel or extended from the manlift, to the extent they will not compromise the safety of the person operating the manlift or other employees working in the area.

3. Contents collected on the drop cloth must be disposed of promptly and in a manner consistent with federal, state, and local laws.

4. Upon completion of any exterior painting of vessels, the surface of the Pier in the vicinity of the painting activity will be inspected for paint drip and cleaned up as necessary.

5. These activities will be monitored to ensure that BMPs are properly implemented.

    **e.**     **Housekeeping:**

    i. The cruise terminal facility Storm Water Pollution Prevention Plan will identify a pollution prevention team responsible for proper application of all BMPs.

    ii. Prior to the beginning of each cruise season, all Port and operator employees and managing representatives of cruise-related vendors or contracted entities working on the Pier with BMP-related duties will be informed about the importance of best management practices at the facility. All employees assigned to perform any function related to BMP implementation must be instructed on how to perform those functions effectively.

    iii. As a result of daily cruise operations, material tracked out of the Service Area onto the pier surface that is beyond the sanitary sewer collection area will be cleaned up at the end of the day's operation.

    iv. At the start of each cruise season, a list of current BMPs specific to cruise terminal operations will be circulated to terminal operator, stevedore companies, all vessels, and all known vendors or on the first occasion that new vessels and vendors arrive at the Pier.

v. When there are vessels at the cruise terminal facility, daily inspections must be conducted of all operations having the potential to contaminate stormwater and to ensure the BMPs are being applied to those operations. Corrections must be immediately made when any problems are found.

vi. The Pier surface during the cruise season will be vacuum swept as follows: Every week or as deemed necessary a vacuum sweeper will be used to spot clean the high traffic areas, and a large mechanical vacuum sweeper-truck will be used once a month during cruise season as well as before and after the cruise season.

    f. **Spill Prevention and Cleanup Program:**

i. A spill prevention and clean-up program that is specific to the facility will be maintained and implemented.

ii. Employees, representatives and contractors with BMP-associated Terminal duties must receive training on spill prevention and cleanup measures at the beginning of each cruise season.

9. The Port must provide Soundkeeper with a report twice a year documenting the implementation of the above BMPs on Pier 66. The report will include the following descriptions: (a) the Port's implementation of each BMP at Pier 66; (b) the entities involved in cruise-related activities who were informed about the BMPs by the Port; and (c) the Port's knowledge regarding the implementation of each BMP by these other entities. The report will identify the author. The Port will obtain information on the implementation of the BMPs to the extent it is reasonably practical from Port internal work orders and information it obtains from the cruise terminal facility operator. This list is not exhaustive or intended to limit the information the Port may provide in the reports.

10. As part of the consideration for this Consent Decree the Port and CTA will implement the BMPs set forth in Paragraph 8 for cruise-related activities at Pier 91, and provide the same reports identified in paragraph 9, above, as will be reflected in the separately enforceable Pier 91 Agreement.

11. Within ten (10) days following the entry of the Consent Decree, the Port shall pay Two Hundred Fifty Thousand Dollars ($250,000) to Soundkeeper. The Port's payments shall be in full and complete satisfaction of any claims Soundkeeper has or may have against the Port, either legal or equitable, and of any kind of nature whatsoever, for fees, expenses, and costs incurred in this litigation, or for civil penalties under the Clean Water Act. Soundkeeper may allocate the payment as it deems appropriate. The parties agree to have payment made by check to the order of "Puget Soundkeeper Alliance c/o Smith and Lowney Trust Account" and deposited in the Smith and Lowney Trust account. The Port will mail the check to 2317 East John Street Seattle, WA 98112, Attn. Knoll Lowney.

12. Within ten (10) days of entry of this Consent Decree, CTA will pay Soundkeeper Two Hundred Fifty Thousand Dollars ($250,000). CTA's payment will be in full and complete satisfaction of any claims Soundkeeper has or may have against CTA, either legal or equitable, and of any kind of nature whatsoever, for fees, expenses, and costs incurred in this litigation, or for civil penalties under the Clean Water Act. Soundkeeper may allocate the payment as it deems appropriate. The parties agree to have payment made by check to the order of "Puget Soundkeeper Alliance c/o Smith and Lowney Trust Account" and deposited in the Smith and Lowney Trust account. CTA will mail the check to 2317 East John Street Seattle, WA 98112, Attn. Knoll Lowney.

13. In consideration of CTA's and the Port's obligations under this Consent Decree, for the term of this Consent Decree, as defined in paragraph 17, below, Soundkeeper covenants not to sue CTA, CTA's members, the Port, or any successor owner or operator of the Facility, or associate with, or support financially or otherwise any other person to sue CTA, CTA's members, or the Port for any of the discharges associated with the cruise-related activities at the Facility that Soundkeeper alleged in its expert reports or pleadings should have necessitated CTA, CTA's members, and/or the Port to obtain coverage for the Facility under Ecology's ISGP.

14. A force majeure event is any event outside the reasonable control of the Port that causes a delay in performing tasks required by this decree that cannot be cured by due diligence. Any delay in performance by the Port of a task required by this Consent Decree caused by a force majeure event is not a failure to comply with the terms of this decree, provided that the Port notifies Soundkeeper of the event; the steps that the Port will take to perform the task; the projected time that will be needed to complete the task; and the measures that have been taken or will be taken to prevent or minimize any impacts to stormwater quality resulting from delay in completing the task.

The Port will notify Soundkeeper of the occurrence of a force majeure event as soon as reasonably possible but, in any case, no later than fifteen days after the occurrence of the event. In such event, the time for performance of the task will be extended for a reasonable period of time following the force majeure event.

By way of example and not limitation, force majeure events include but are not limited to:

a. Acts of God, war, insurrection, terrorism, or civil disturbance;
b. Earthquakes, landslides, fire, floods;
c. Actions or inactions of third parties over which defendant has no control;
d. Unusually adverse weather conditions;
e. Restraint by court order or order of public authority;
f. Strikes or other labor disruptions;
g. Any permit or other approval sought by the Port from a government authority to implement any of the actions required by this consent decree where such approval is not granted or is delayed, and where the Port has timely and in good faith sought the permit or approval; and
h. Litigation, arbitration, or mediation that causes delay.

15. This Consent Decree takes effect on the date it is entered by the Court. It terminates 10 years after the date of entry unless good cause exists for earlier termination based upon either a material change of cruise-related activities that are subject to the above BMPs, or a material change in the water quality regulations regarding these activities. If either party believes that there has been a material change in either the cruise-terminal activities or water quality regulations, that party may ask the Court under its continuing jurisdiction to terminate the Consent Decree on that basis. Before applying to the Court for this determination, the parties must first provide written notice to the other parties of the material change(s) alleged to have occurred and then meet and attempt to resolve any dispute regarding the allegations and discuss any suggested measures for resolving the dispute. A meeting should be held as soon as practical after providing the written notice but must be held within 30 days after such notice, provided, however, that if the party(ies) who opposes early termination fails to meet with the party who proposes early termination within 30 days after such notice, the party(ies) who proposes early termination may ask the Court to terminate the Consent Decree without further delay. Any notice as required by this paragraph must be sent via first class mail to the party and to its counsel of record.

16. This Consent Decree may not be used as evidence in any proceeding or as an admission or adjudication with respect to any allegations in the Complaint or any fact or conclusion of law with respect to any matter alleged in or arising out of the Complaint.

17. The Court retains jurisdiction over this matter. While this decree remains in force, this case may be reopened without filing fee so that the parties may apply to the Court for any further order that may be necessary to construe, carry out, enforce compliance, and/or resolve any dispute regarding the terms or conditions of the Consent Decree until termination of the Consent Decree. Before applying to the Court for relief, the parties must first attempt to resolve any dispute regarding implementation of, or compliance with, this Consent Decree by: 1) providing written notice to the other parties of the dispute; and 2) meeting to discuss the dispute

and any suggested measures for resolving the dispute.  Such a meeting should be held as soon as practical but must be held within 30 days after notice of a request for such a meeting to the other party and its counsel of record.  No application may be made to the Court until after the notice and meeting required under this paragraph except that the party(ies) who provide notice of a dispute may apply to the Court without further delay if the other party(ies) fail to meet within 30 days after notice of a request for meeting.  The prevailing or substantially prevailing party in any proceedings to enforce the terms and conditions of this Consent Decree will be entitled to its reasonable attorneys' fees and costs.

18. The parties recognize that, pursuant to 33 U.S.C. § 1365(c)(3), no consent judgment can be entered in a Clean Water Act suit to which the United States is not a party prior to 45 days following the receipt of a copy of the proposed consent judgment by the U.S. Attorney General and the Administrator of the U.S. EPA.  Therefore, upon the signing of this Consent Decree by the parties, Soundkeeper will serve copies of it upon the Administrator of the U.S. EPA and the Attorney General.

19. The parties have participated in drafting this decree.  The terms of this Consent Decree will be construed without regard to who drafted the various provisions and will be construed as though both parties participated equally in the drafting.  Accordingly, any rule of construction that a document is to be construed against the drafting party is not applicable to this Consent Decree.

20. This Consent Decree may be modified only upon the approval of the Court.

21. If for any reason the Court declines to approve this Consent Decree in the form presented, this Consent Decree is voidable at the discretion of any party.  The parties agree to continue negotiations in good faith in an attempt to cure any objection raised by the Court to entry of this Consent Decree.

22. Notifications required by this Consent Decree must be in writing.  The sending party may use any of the following methods of delivery: (1) personal delivery; (2) registered or

ORDER ENTERING CONSENT DECREE
PAGE - 10

certified mail, in each case return receipt requested and postage prepaid; (3) a nationally recognized overnight courier, with all fees prepaid; or (4) e-mail. For a notice or other communication regarding this Consent Decree to be valid, it must be delivered to the receiving party at the addresses listed below or to any other address designated by the receiving party in a notice in accordance with this paragraph.

**If to Soundkeeper:**

Katelyn Kinn
Puget Soundkeeper Alliance
130 Nickerson Street, Suite 107
Seattle WA 98109
Email: katelyn@pugetsoundkeeper.org

and to:

Smith & Lowney PLLC
2317 East John St.
Seattle, WA 98112
Email: marcz@igc.org

**If to Port of Seattle:**

Thomas H. Tanaka
Port of Seattle
2711 Alaskan Way, Pier 69
PO Box 1209
Seattle, WA 98111-1209
Email: Tanaka.t@portseattle.org

and to:

Tom McDonald
Cascadia Law Group PLLC
606 Columbia St. NW, Suite 212
Olympia, WA 98501
Email: tmcdonald@cascadialaw.com

**If to CTA:**

Jean Cox
Cruise Terminals of America, LLC
2225 Alaska Way
Seattle, WA 98121
Email: jean.cox@seattlepier66.com

and to:

Dianne K. Conway
Gordon Thomas Honeywell LLP
1201 Pacific Ave., Suite 2100
Tacoma, WA 98407
Email: dconway@gth-law.com

A notice or other communication regarding this Consent Decree is effective when received, unless the notice or other communication is received after 5:00 p.m., in which case the notice will be deemed received at 9:00 a.m. on the next business day. A notice or other communication will be deemed to have been received: (a) if it is delivered in person or sent by registered or certified mail or by nationally recognized overnight courier, upon receipt as indicated by the date on the signed receipt; or (b) if the receiving party rejects or otherwise refuses to accept it, or if it cannot be delivered because of a change in address for which no notice was given, then upon that rejection, refusal, or inability to deliver; or (c) for notice provided via e-mail, upon receipt of a response by the party providing notice or other communication regarding this Consent Decree.

DATED this 6th day of July 2016.

_____
John C. Coughenour
UNITED STATES DISTRICT JUDGE